Julie A. Vogelzang (SBN 174411)
Lisa Hird Chung (SBN 246766)
Bryce A. Young (SBN 274960)
**DUANE MORRIS LLP**
750 B Street, Suite 2900
San Diego, CA 92101-4681
Telephone: 619 744 2200
Facsimile: 619 744 2201
E-mail: jvogelzang@duanemorris.com
        lchung@duanemorris.com
        byoung@duanemorris.com

Attorneys for Defendants John Paul
Mitchell Systems, Von Curtis, Inc., P.M.
Advanced Education, Inc., Paul Mitchell
Advanced Education LLC, PMNV Las
Vegas, LLC, PMCA Bakersfield, LLC,
PMHBW LLC, D'Ann Evans, Ann Marie
Safadi, Winn Claybaugh, and John Paul
DeJoria

Gina Haggerty Lindell (SBN 217258)
Susanna Ryan Matingou (SBN 208103)
**GORDON & REES, LLP**
101 W. Broadway, Suite 2000
San Diego, CA 92101
Telephone: (619) 696-6700
Facsimile: (619) 696-7124
Email: glindell@gordonrees.com
       smatingou@gordonrees.com

Attorneys for Defendants P2W Learning
Systems, LLC and Paul Mantea

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLAIRE GERARD, an individual, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>JOHN PAUL MITCHELL SYSTEMS, a California Corporation, *et al.*,<br><br>Defendants. | Case No. 2:14-cv-04999-DSF (SHx)<br><br>**SCHOOL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:    July 25, 2016<br>Time:    1:30 p.m.<br>Ctrm:    1<br>Judge:   Hon. Dale S. Fischer<br><br>Cons. Compl. Filed: Sept. 29, 2014<br>Trial Date:    March 14, 2017 |

Defendants PMNV LAS VEGAS, LLC ("Las Vegas School"), PMCA BAKERSFIELD, LLC ("Fresno School"), PMHBW LLC ("East Bay School"), and P2W Learning Systems, LLC ("Sherman Oaks School") (collectively, "School Defendants") respectfully submit the following Memorandum of Points and Authorities in Support of Motion for Summary Judgment against Plaintiffs CLAIRE GERARD, MELODY NORTHROP, BERENISA CORTES PALOMINOS, DYLAN THOMAS, and FRANCES HANDCOCK (collectively, "Plaintiffs").

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ............................................................................... 1

II. STATEMENT OF RELEVANT FACTS ........................................... 2

    A.    School Defendants Provide Education Regulated by the Government ...................................................................................... 2

    B.    Plaintiffs' Enrollment at the School Defendants ........................ 3

    C.    Plaintiffs' General Education at the School Defendants ............ 4

          1.    Core Phase ....................................................................... 5

          2.    Protégé Phase ................................................................. 6

          3.    Adaptive Phase .............................................................. 6

          4.    Creative Phase ............................................................... 7

          5.    Concentration on Passing Cosmetology Licensure Exam ........... 7

    D.    Plaintiffs Learned Valuable Cosmetology Skills in Clinic Classrooms ................................................................................. 8

          1.    Plaintiffs Received Supervised, Hands-On Practice on Guests ............................................................................. 8

                a.    Learning Requirements Before Each Service ................... 8

                b.    Learning Requirements During Each Service ................... 9

                c.    Learning Requirements After Each Service ..................... 9

                d.    Plaintiffs Agree Practicing on Guests Was Beneficial ..... 10

          2.    Plaintiffs Also Learned About Customer Service, Sanitation, Mixing and Dispensing Product ................................ 11

                a.    Front Desk Greeter ........................................... 11

                b.    Dispensary, Washhouse, and Color Bar ..................... 11

                c.    Sanitation and Cleanliness of Stations .................... 12

    E.    Plaintiffs' Graduation, Licensure, and Employment ............... 13

III. SUMMARY JUDGMENT STANDARD ........................................ 14

IV. LEGAL ARGUMENT ..................................................................... 14

    A.    Plaintiffs' FLSA Claims Fail as a Matter of Law ................... 15

i

B.   *Portland Terminal's* Economic Reality Test Is Determinative ............ 16

C.   Federal Courts Hold Cosmetology Students Are Not Employees ........ 19

1.   Northern District of California Concludes Cosmetology Students Are Not Employees in *Benjamin v. B&H Education* .. 20

2.   Northern District of Illinois Concludes Cosmetology Students Are Not Employees in *Hollins v. Regency Corp.* ........ 21

3.   District of Colorado Concludes Cosmetology Students Are Not Employees in *Ortega v. Denver Inst. LLC* .......................... 23

4.   Eastern District of Pennsylvania Concludes Students Are Not Employees in *Jochim v. Jean Madeline Educ. Ctr. of Cosmetology* ................................................................................ 25

5.   District of New Jersey Concludes Cosmetology Students Are Not Employees in *Atkins v. Capri Training Ctr., Inc.* .................. 25

D.   The Economic Reality Shows Plaintiffs Were Not Employees ............ 26

E.   Plaintiffs' Claims Under California Law Fail as a Matter of Law ........ 34

1.   Plaintiffs Were Not Employees Under California Statutory Law ................................................................................................ 35

2.   Plaintiffs Were Not Employees under California Case Law ...... 35

3.   California Labor Commissioner Guidance Confirms Plaintiffs Were Not Employees ................................................. 37

F.   Plaintiff's Claims Under Nevada Law Fail as a Matter of Law ........... 39

V.   CONCLUSION ............................................................................................. 40

ii

SCHOOL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF   MOTION FOR SUMMARY JUDGMENT                                          Case No. 2:14-cv-04999-DSF (SHx)

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### <u>Federal Cases</u>

*Atkins v. Capri Training Ctr., Inc.*
    No. 2:13-cv-06820, 2014 WL 4930906 (D.N.J. Oct. 1, 2014) ................. Passim

*Benjamin v. B&H Educ., Inc.*
    Case No. 13-cv-04993, 2015 WL 6164891 (N.D. Cal. Oct. 16, 2015),
    *appeal docketed*, No. 15-17147 (9th Cir. Oct. 28, 2015) .......................... Passim

*Berger v. Nat'l Coll. Athletic Ass'n.*
    __F. Supp. 3d __, 2016 WL 614365 (S.D. Ind. Feb. 16, 2016)........................ 18

*Blair v. Wills*
    420 F.3d 823 (8th Cir. 2005) ................................................................. 19

*Bonnette v. California Health & Welfare Agency*
    704 F.2d 1465 (9th Cir.1983), *abrogated on other ground by Garcia
    v. San Antonio Met. Transit Auth.*, 469 U.S. 528 (1985) .................................. 17

*Brock v. Superior Care, Inc.*
    840 F.2d 1054 (2d. Cir. 1988) .............................................................. 16

*Cal. Pro-Life Council, Inc. v. Getman*
    328 F.3d 1088 (9th Cir. 2003) ............................................................. 36

*Ford v. Yasuda*
    No. 13-1961, 2014 WL 9887277 (C.D. Cal. July 30, 2014) ........................... 36

*Fraticelli v. MSG Holdings, L.P.*
    13-civ-6518, 2015 WL 8491038 (S.D.N.Y. Dec. 10, 2015) ........................... 18

*Galen v. Cnty. of Los Angeles*
    477 F.3d 652 (9th Cir. 2007) ............................................................... 14

*Gieg v. DRR, Inc.*
    407 F.3d 1038 (9th Cir. 2005) ............................................................. 15

*Gilbreath v. Cutter Biological, Inc.*
    931 F.2d 1320 (9th Cir. 1991) ............................................................. 17

*Glatt v. Fox Searchlight Pictures, Inc.*
  811 F.3d 528 (2d Cir. 2016) ..................................................... Passim

*Goldberg v. Whitaker House Coop., Inc.*
  366 U.S. 28 (1961)......................................................................16

*Hale v. Arizona*
  993 F.2d 1387 (9th Cir. 1993) ............................................ 16, 32

*Harris v. Vector Mktg. Corp.*
  753 F.Supp.2d 996 (N.D. Cal. 2010).............................................38

*Hess v. Madera Honda Suzuki*
  No. 1:10-cv-1821, 2012 WL 4052002 (E.D. Cal. Sept. 14, 2012).....................17

*Hollins v. Regency Corp.*
  __ F. Supp. 3d __, No. 13 C 07686, 2015 WL 6526964 (N.D. Ill., Oct. 27, 2015) *appeal docketed*, 15-3607 (7th Cir. Nov. 20, 2015) .................. Passim

*Jochim v. Jean Madeline Educ. Ctr. of Cosmetology, Inc*
  98 F. Supp. 3d 750 (E.D. Pa. 2015).......................................... Passim

*Kaplan v. Code Blue Billing & Coding, Inc.*
  504 Fed. Appx. 831 (11th Cir. 2013) ....................................19, 29, 31

*Klein v. Octagon, Inc.*
  14-cv-6770, 2015 WL 5821629 (S.D.N.Y. Sept. 30, 2015)..............................18

*Lane v. Carolina Beauty Sys., Inc.*
  No. 6:90CV00108, 1992 WL 228868 (M.D.N.C. July 2, 1992)............ 28-29, 31

*Mark v. Gawker Media LLC*
  No. 13-CV-4347, 2016 WL 1271064 (S.D.N.Y. Mar. 29, 2016) ............. Passim

*Marshall v. Regis Educ. Corp.*
  666 F.2d 1324 (10th Cir. 1981) ....................................................19, 31

*Marshall v. Regis Educ. Corp.*
  666 F.3d 1324 (10th Cir. 1981) .......................................................22

*Ortega v. Denver Inst. L.L.C.*
  No. 14-cv-01351, 2015 WL 4576976 (D. Colo. July 30, 2015) ................ Passim

*Purdham v. Fairfax County Sch. Bd.*
    637 F.3d 421 (4th Cir. 2011) ................................................................. 15

*Rutherford Food Corp. v. McComb*
    331 U.S. 72 (1947) .................................................................................. 16

*Ryman v. Sears, Roebuck and Co.*
    505 F.3d 993 ........................................................................................... 36

*Schumann v. Collier Anesthesia, P.A.*
    808 F.3d 1199 (11th Cir. 2015) ................................................... Passim

*Solis v. Laurelbrook Sanitarium & Sch., Inc.*
    642 F.3d 518 (6th Cir. 2011) ....................................................... Passim

*Steshenko v. McKay*
    No. C 09-5543, 2014 WL 494865 (N.D. Cal. Feb. 4, 2014) ............................. 19

*Tony & Susan Alamo Found. v. Sec. of Lab.*
    471 U.S. 290 (1985) ................................................................................ 16

*Vanskike v. Peters*
    974 F.2d 806 (7th Cir. 1992) ................................................................ 32

*Vlad-Berindan v. Metro. Transp. Auth.*
    14-cv-10304, 2016 WL 1271502 (S.D.N.Y. March 31, 2016) ................. Passim

*Walling v. Portland Terminal Co.*
    330 U.S. 148 (1947) ...................................................................... Passim

*Williams v. Strickland*
    87 F.3d 1064 (9th Cir. 1996) ........................................................ 16-17

**California Cases**

*Hutchison v. Clark*
    153 P.2d 796 (Cal. Ct. App. 1944) ................................................ 35-37

*Jackson v. AEG Live, LLC*
    183 Cal. Rptr. 3d 394 (2015) ............................................................... 38

*Martinez v. Combs*
    49 Cal.4th 35 (2010) ..................................................................... 36, 38

*Zuri-Kinshasa Maria Terry v. Sapphire/Sapphire Gentlemen's Club*
    336 P.3d 951 (2015).......................................................................................39

**Other State Cases**

*Ind. Comm'n v. Am. Beauty College, Inc.*
    447 P.2d 531 (Colo. 1968)...........................................................................36

**Federal Statutes**

29 U.S.C. § 203(e)(1) [Fair Labor Standards Act] ................................................16

29 U.S.C. § 203(g) [Fair Labor Standards Act]...................................................16

**State Statutes**

Cal. Bus. & Prof Code, Ch. 10, Div. 3 .............................................................2, 35

Cal. Bus. & Prof. Code § 7317 ...............................................................35, 29, 32

Cal. Bus. & Prof. Code § 7321 ...............................................................15, 29, 32

Cal. Bus. & Prof. Code § 7338 ...........................................................................33

Cal Bus & Prof. Code § 7349 ......................................................................*passim*

Cal. Bus. & Prof. Code § 7402–08 .....................................................................35

Cal. Bus. & Prof. Code §§ 7362–67 ...................................................................15

Cal. Code Regs., tit. 5, § 71720 ........................................................................15

Cal. Code. Regs., tit. 16, §§ 909 ............................................................15, 29, 32

Cal. Code Regs., tit. 16, §§ 940–950.10 ............................................................33

Cal. Code Regs., tit. 16, § 950.1–.5 ..............................................................15, 33

Cal. Code Regs., tit. 16, § 974 ........................................................15, 29, 32, 35

Cal. Code Regs., tit. 16, § 976 ...........................................................................35

Cal. Code Regs., tit. 16, §§ 978–995 .................................................................34

Nev. Rev. Stat. § 644.190 ....................................................................15, 32, 29, 39

Nev. Rev. Stat. § 644.200 ...................................................................15, 32, 29

Nev. Rev. Stat. §§ 644.240–.248 ..................................................................34

Nev. Rev. Stat. § 644.395 ...............................................................................15

Nev. Rev. Stat. §§ 644.400 ......................................................................15, 33

**Rules**

Fed. R. Civ. P. 56(a) ......................................................................................14

**Regulations**

Nev. Admin. Code § 644.115–.123 ...........................................................15, 33

Nev. Admin. Code § 644.145 .........................................................................28

Nev. Admin. Code §§ 644.335–.372 ..............................................................34

## STATEMENT OF ISSUES

1.  Whether Plaintiffs, while they were cosmetology students enrolled at the School Defendants, became "employees" of the School Defendants under the Fair Labor Standards Act when Plaintiffs learned and practiced cosmetology skills in the School Defendants' clinic classroom, which simulated a professional cosmetology salon and provided Plaintiffs with state-required clock hours necessary for graduation and eligibility to take the state licensure exam?

2.  Whether Plaintiffs, while they were cosmetology students enrolled at the School Defendants, became "employees" of the School Defendants under California law when Plaintiffs learned and practiced cosmetology skills in the School Defendants' clinic classroom, which simulated a professional cosmetology salon and provided Plaintiffs with state-required clock hours necessary for graduation and eligibility to take the state licensure exam?

3.  Whether Plaintiffs, while they were cosmetology students enrolled at the School Defendants, became "employees" of the School Defendants under Nevada law when Plaintiffs learned and practiced cosmetology skills in the School Defendants' clinic classroom, which simulated a professional cosmetology salon and provided Plaintiffs with state-required clock hours necessary for graduation and eligibility to take the state licensure exam?

## I.   **INTRODUCTION**

This case is one of 21 nearly identical cases ("Cosmetology Cases") filed simultaneously across the country.  In each Cosmetology Case, cosmetology students allege they were employees under the Fair Labor Standards Act ("FLSA") and its state counterparts for the time they spent learning and practicing their skills in the schools' clinic classrooms.  In the five Cosmetology Cases to reach a decision on the merits, the district courts unanimously granted summary judgment against the students, concluding as a matter of law that the students were *not* employees of the schools.

Other courts that have addressed cases where students alleged they were entitled to wages have held that the students were not so entitled when they were enrolled in a bona fide educational program.  Rather, the economic reality of the relationship between the schools and the students in those cases confirmed that the students were—always and solely—students, learning and practicing their vocation in a legitimate educational program.  The same rings true here: Plaintiffs were prohibited by law from beginning a career as cosmetologists until after they completed School Defendants' programs, which were overseen by government agencies and accreditors.

Clinic classrooms are but one component of a comprehensive educational curriculum provided to Plaintiffs by the School Defendants.  As a matter of economic reality, cosmetology students learning and practicing their skills in clinic classrooms are not employees of the schools.  Plaintiffs always knew they were students.  Plaintiffs admit they benefitted greatly from learning and practicing their skills in the clinic classrooms, which are designed to simulate a real salon where Plaintiffs received hands-on training by practicing on guests under the supervision of instructors.  Plaintiffs did not apply for employment.  They did not expect to be paid. They did not expect to be employed by the School Defendants after graduation.

The undisputed evidence presented below confirms that the economic relationship between the Plaintiffs and the Defendant Schools was one of student-school, not employee-employer.

SCHOOL DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF   MOTION FOR SUMMARY JUDGMENT                                                                      Case No. 2:14-cv-04999-DSF (SHx)

## II.   STATEMENT OF RELEVANT FACTS

### A.   School Defendants Provide Education Regulated by the Government

The School Defendants are for-profit vocational schools that are nationally accredited by the National Accrediting Commission of Career Arts & Sciences ("NACCAS").  (Statement of Uncontroverted Facts ("SUF") ¶ 1.)  NACCAS is an agency recognized by the U.S. Department of Education ("DOE") as a national agency for the institutional accreditation of postsecondary schools and departments of cosmetology arts and sciences.  (SUF ¶ 2.)  The School Defendants are eligible under federal law to disburse Federal Student Aid to enrolled students.  (SUF ¶ 3.)

The California Board of Cosmetology & Barbering ("CA Board") oversees all California cosmetology and barbering schools, as well as California cosmetologists and barbers.  (SUF ¶ 4.)  The CA Board enforces the California Cosmetology and Barbering Act, which applies to the School Defendants and governs to health and safety, equipment, curriculum, examinations, instructor qualifications and California Building Code requirements.  (SUF ¶ 5.)  The three California School Defendants (Fresno, East Bay and Sherman Oaks Schools) are each licensed by the CA Board. (SUF ¶ 6.)  The School Defendants are also approved and subject to oversight by the California Bureau for Private Postsecondary Education ("BPPE").  (SUF ¶ 7.)

The Las Vegas School is licensed to operate by the Nevada Board of Cosmetology ("NV Board"), which is charged with licensing and overseeing all Nevada cosmetologists and schools of cosmetology.  (SUF ¶¶ 8, 10.)  The NV Board enforces the provisions of the Nevada Cosmetology Act, including those related to health and safety issues, equipment, school curriculum, qualifications for licensure examination, instructor qualifications, and prohibited practices.  (SUF ¶ 9.)

The School Defendants utilized a legally-required curriculum that includes required  "clock" (or "credit") hours dedicated to enumerated topics, such as hairstyling, haircutting, health and safety considerations, and disinfection and sanitation.  (SUF ¶ 11.)  In doing so, School Defendants provided student-to-teacher

1  ratios much lower than the state-required ratio of 25:1, and regularly had ratios at or

2  under one instructor per 10-15 students during Plaintiffs' enrollments.  (SUF ¶ 12.)

3      **B.     Plaintiffs' Enrollment at the School Defendants**

4      Plaintiffs Handcock, Palominos, Thomas, Gerard, and Morales enrolled in the

5  cosmetology programs at, respectively, the Fresno School, East Bay School, Las

6  Vegas School, and Sherman Oaks School and they all began classes between 2009 and

7  2012.  (SUF ¶¶ 13–17.)  The cosmetology programs at the East Bay, Fresno, and

8  Sherman Oaks Schools provided the 1600-clock hour educational requirement under

9  California law.  (SUF ¶ 18.)  The cosmetology program at the Las Vegas School

10  during Plaintiff Thomas' enrollment provided the 1800-clock hour education

11  requirement under then-current Nevada law.  (SUF ¶ 19.)  The School Defendants

12  utilized an electronic system to record Plaintiffs' attendance and to verify Plaintiffs

13  had completed the requisite number of hours to graduate and be eligible to take their

14  respective state's cosmetology exam.  (SUF ¶ 20.)

15      Each of the Plaintiffs signed Enrollment Contracts with the School Defendants.

16  (SUF ¶ 22.)  The Enrollment Contracts provided that each Plaintiff was enrolling and

17  agreed to pay tuition in exchange for educational services.  (*Id.*)  The Enrollment

18  Contracts also described each Plaintiff's right to withdraw from the program and

19  receive a pro-rata tuition refund, as well as an additional instructional charge per hour

20  if the Plaintiff failed to complete the program within 110% of the scheduled time.

21  (*Id.*)  Plaintiffs agreed to comply with the requirements in the School Defendants'

22  student catalogs and professional development guidelines.  (*Id.*)  Plaintiffs

23  acknowledged in the Enrollment Contracts that, although "the school will assist

24  students in finding employment by posting employment opportunities and teaching

25  classes on seeking employment," "the school cannot guarantee placement" after

26  graduation.  (*Id.*)

27      Plaintiffs never expected—nor were they promised—that School Defendants

28  guaranteed Plaintiffs would find employment after graduation.  (SUF ¶ 23.)  Plaintiffs

knew they were always students of the School Defendants.  Plaintiffs did not apply for employment with, nor were they ever hired by, the School Defendants.  (SUF ¶ 24.) They never expected to receive wages, benefits, and/or protections afforded to employees from the School Defendants.  (SUF ¶ 25.)  They had no expectation that they would be employed by the School Defendants.  (*Id.*)

Plaintiffs were offered and/or received federal grants and/or student loans to fund their education.  (SUF ¶ 26.)  Plaintiffs knew they were only eligible for these grants and/or student loans based on their status as students, and only so long as they were enrolled in an academic program.  (SUF ¶ 27.)  Plaintiffs also knew that, once they graduated or withdrew from the program, they would have to pay back the student loans or return some of the loaned amount because they were no longer students.  (SUF ¶ 28.)

### C.   Plaintiffs' General Education at the School Defendants

School Defendants' curriculum covered many facets of beauty instruction and the cosmetology profession, including training on performing beauty services (haircuts, color, etc.); use and sanitization of tools, products and equipment; health and safety issues; and client services (communications, consultations, identifying beauty needs, recommending  products).  (SUF ¶ 29.)  Plaintiffs received credit for all of their education, whether they were listening to a lecture, taking quizzes, studying, learning customer service skills, practicing on mannequins, each other, models, or paying members of the public (referred to as "guests"), and/or sanitizing their stations and equipment.  (SUF ¶ 30.)  That credit went toward satisfying the statutorily required hours so they were then eligible to take their state's licensure exam to become licensed cosmetologists.  (SUF ¶ 31.)

A portion of Plaintiffs' education took place in clinic classrooms.  (SUF ¶ 32.) Clinic classrooms were designed to mimic a professional salon.  (SUF ¶ 33.)  In the clinic classroom, part of Plaintiffs' time was spent practicing on guests so that they could learn customer service skills and how to service guests' beauty needs, as well as

how to recommend beauty products.  (SUF ¶ 34.)  These skills take time and consistent practice to develop, but are expected by potential employers.  (SUF ¶ 35.) Another portion of Plaintiffs' time in the clinic classroom was spent learning and practicing other cosmetology skills, such as sanitation, cleanliness requirements, color, mixing and dispensing methods, and habits specific to the beauty industry that would aid them in creating success in their chosen field.  (SUF ¶ 36.)

The School Defendants' curriculum was divided into four progressive phases— Core, Protégé, Adaptive, and Creative (the last few weeks of which were devoted to preparing for the state licensure examination).  (SUF ¶ 37.)  In each phase, Plaintiffs were, at all times, taught, supervised and guided by licensed instructors.  (SUF ¶ 38.)

### 1.    Core Phase

During the first phase, Core, Plaintiffs received all of their instruction in a traditional classroom setting (the "theory classroom").  (SUF ¶ 39.)  In theory classrooms, Plaintiffs learned by reading textbooks, listening to instructors' lectures, watching informational videos and instructors' demonstrations, and practicing services on mannequins and each other.  (SUF ¶ 40.)  Plaintiffs' instructors demonstrated cosmetic services on a mannequin (also referred to as a doll head).  (SUF ¶ 41.) Plaintiffs then practiced what they learned on doll heads, following along with the instructor's training on various procedures such as haircuts or color.  (SUF ¶ 42.) Plaintiffs in this part of the program did not practice cosmetic services on members of the public, although they would practice on each other in a step-by-step fashion.  (SUF ¶ 43.)  Plaintiffs' final exam in the Core phase was to perform a haircut on a live person.  (SUF ¶ 44.)  Core lasted for 210 clock hours for Plaintiffs Handcock, Palominos, Gerard, and Northrop at their California schools and typically took six weeks to complete, whereas Core was 300 clock hours for Plaintiff Thomas at his Nevada school and took approximately nine weeks to complete.  (SUF ¶¶ 45, 46.)

### 2.   <u>Protégé Phase</u>

After completing Core, Plaintiffs advanced to Protégé.  (SUF ¶ 47.)  During the Protégé phase, Plaintiffs spent part of each day learning in the theory classroom, and spent the other part shadowing senior students who were practicing on guests in the clinic classroom.  (SUF ¶ 48.)  Plaintiffs did not have guests assigned to them, but practiced under an instructor's supervision in a manner that was side-by-side with senior students, such as by rinsing a guest's hair, folding foil, or mixing colors for a color service.  (SUF ¶ 49.)  The Protégé phase, which is about two weeks in length, is intended to create a "smooth transition from Core future professional to Adaptive future professional [by] preparing [the student] for the clinic experience."  (SUF ¶ 50.)

### 3.   <u>Adaptive Phase</u>

Plaintiffs then advanced to the Adaptive phase, where they increased their hands-on experience.  They spent mornings in the clinic classrooms, learning and practicing a variety of skills on live guests, doll heads and each other.  (SUF ¶ 51.)  In the clinic classroom, Plaintiffs not only practiced on live guests and doll heads—they also observed students or instructors in "mini classes," studied educational materials, and practiced customer service and concierge-type duties, discussed *infra*.  (SUF ¶ 52.)  After a lunch break, Plaintiffs spent their afternoons in theory classrooms listening to instructors' lectures, watching informational videos, and practicing services on mannequins and each other.  (SUF ¶ 53.)  During Plaintiffs' enrollment, the Adaptive phase consisted of approximately 690 hours for the Fresno, East Bay and Sherman Oaks Schools, and 600 hours for the Las Vegas School.  (SUF ¶ 54.)

Plaintiff Handcock wrote on her Adaptive Graduate Survey that she "love[d] the hands on instruction," that "all of [her education]" was "beneficial," that she felt she had "obtained knowledge in all areas covered," and that her instructors were "very helpful!!!"  (SUF ¶ 55.)  Plaintiff Gerard stated in her Adaptive Graduate Survey that the part of the instruction that was "most beneficial" was "The specialty classes and help from the learning leaders during our time on the clinic floor."  (*Id.*)  Plaintiff

6

Northrop stated in her Adaptive Graduate Survey that she was "properly prepared" and that she "loved them all," referring to her instructors.  (*Id.*)

### 4. __Creative Phase__

After completing the Adaptive phase, Plaintiffs advanced to the Creative phase, where they practiced with more freedom to "use [their] own artistic and creative abilities, coupled with the assistance of the Learning Leaders, to prepare [themselves] for [their] future salon career." (SUF ¶ 56.)  Plaintiffs received instruction in the theory classroom in the morning, and they practiced their skills in the clinic classroom in the afternoon.  (SUF ¶ 57.)  Because clinic classrooms typically received more guests in the afternoons, Plaintiffs in the Creative phase had more opportunities to "hon[e their] skills" and get "close to . . . practic[ing] them daily."  (SUF ¶ 58.)  Some Creative students applied to the "Phase Two" program, which was a separate portion of the clinic where accelerated students received more advanced hands-on practice on live guests.  (SUF ¶ 59.)  Guests who chose to receive services from a Phase Two student paid a "slightly higher" price because of "the setup and the flow of that area of the classroom" and to signify it as an accelerated learning course.  (SUF ¶ 60.)

During both Creative and Adaptive phases, Plaintiffs' instruction on Saturdays took place solely in the clinic classroom because it was the busiest day for the clinic classroom and thus provided students with the greatest supply of paying customers and variety of learning experiences.  (SUF ¶ 61.)

### 5. __Concentration on Passing Cosmetology Licensure Exam__

During the final weeks of the curriculum, instructors focused on teaching Plaintiffs how to study for, take and pass the state cosmetology licensure exam.  (SUF ¶ 62.)  Plaintiffs completed mock state board written and practical exams.  (SUF ¶ 63.) Instructors also illustrated the state board application and licensing requirements. (SUF ¶ 64.)  Plaintiffs earned clock hours for this time.  (SUF ¶ 65.)

### D.   Plaintiffs Learned Valuable Cosmetology Skills in Clinic Classrooms

The School Defendants publicized that they were *schools* and that any public services were provided by *students*.  A large sign outside of each School Defendant's building read, "Paul Mitchell The School."  (SUF ¶ 66.)  Signs posted in the lobby of each School Defendant notified guests that unlicensed students perform all services under the direction of an instructor.  (SUF ¶ 67.)  Plaintiffs wore all black clothing and had nametags identifying them as "Future Professionals," as compared to their instructors, who wore black and white and had name tags identifying them as "Learning Leaders."  (SUF ¶ 68.)  Also, before receiving any service, each guest "sign[ed] a waiver saying [they were] getting [services from] a student."  (SUF ¶ 69.)

### 1.   Plaintiffs Received Supervised, Hands-On Practice on Guests

#### a.   *Learning Requirements Before Each Service*

The public entrance to each clinic classroom led to a reception area with a front desk.  (SUF ¶ 70.)  The front desk was staffed by a paid School Defendant employee, who was responsible for answering phones, making appointments, filling out service tickets, and collecting payments for services and products.  (*Id.*)

When a new guest arrived, the front desk employee called the next Adaptive or Creative student in the rotation, which ensured all students received an equal turn to practice their skills on as many guests as possible.  (SUF ¶ 71.)  The assigned students received a "Service Ticket" that contained the guest's name and requested service.  (SUF ¶ 72.)  Plaintiffs introduced her/himself, brought the guest to a station, and then practiced "a consultation to find out what [the guest] wanted and then how [Plaintiff was] going to achieve it" and discussed the guest's "hair history" so as to formulate the plan for the service.  (SUF ¶ 73.)

At the start of each service, Plaintiffs were required to meet with an instructor so that the instructor could approve the Plaintiffs' proposed plan. Plaintiffs could "tell them [his/her] game plan and what [he/she was] going to do, how [he/she is] going to do it, and [the instructors] would tell [him/her] 'okay' or 'no, [he/she] should do this,'

and then do it." (SUF ¶ 74.)  In the Plaintiffs' presence, the instructor spoke with the guest to confirm the service before the Plaintiffs began.  (SUF ¶ 75.)  The instructor then signed the Plaintiffs' Service Ticket to signify instructor approval.  (SUF ¶ 76.)

### b.    *Learning Requirements During Each Service*

Plaintiffs were taught to solicit feedback from licensed instructors during the performance of the service, thereby developing the communication skills to handle spontaneous requests and ensure guests are satisfied.  (SUF ¶ 77.)  The School Defendants required instructors to monitor each student, instruct on strategy and techniques for performing the services, and be available to answer any questions and guide Plaintiffs during the services.  (SUF ¶ 78.)  If an instructor was not standing next to the Plaintiffs while they practiced, Plaintiffs could "go look for a learning leader [and] get help" if they had a question because "there was always [an instructor] on the [clinic] floor," although some Plaintiffs expressed frustration at having to wait "a few minutes" if the instructor was helping another student.  (SUF ¶ 79.)

### c.    *Learning Requirements After Each Service*

Upon completion of every service, an instructor evaluated the outcome, signed the Plaintiff's Service Ticket to verify that the service was completed properly under the instructor's direction—i.e., to "verif[y] that [Plaintiff] did what the client wanted, [that Plaintiff] used the right technique"—and discussed any alternative methods for performing the service.  (SUF ¶ 80.)  Plaintiffs also could ask the instructor any remaining questions they had.  (SUF ¶ 81.)  Plaintiffs were required to attempt to perform the service assigned to them, but they were never disciplined by School Defendants in any way for performing a service poorly or for taking too long to complete it, even if the guest was upset with the Plaintiff's performance.  (SUF ¶ 82.)  After the instructor signed the Plaintiff's Service Ticket, the Plaintiff escorted the guest back to the front desk to pay for the service, purchase products, if desired, and make an appointment for future services, if desired, all of which were part of the curriculum to teach skills used by licensed cosmetologists.  (SUF ¶ 83.)  Thus, when

9

practicing on guests, licensed instructors guided Plaintiffs before beginning a service, during the service, and at the end of the service.

In the middle or end of a service, Plaintiffs also practiced identifying guests' individual needs and recommending helpful products (which they learned about during theory and other classes). (SUF ¶ 84.) Plaintiffs received credit toward their licensure requirements for all the time spent learning about products and discussing products with guests. (SUF ¶ 85.) Plaintiffs were not required to recommend or sell products to guests. (SUF ¶ 86.) If they chose to do so, Plaintiffs could "set their own goals" but the School Defendants did not impose on Plaintiffs a quota or sales requirement for retail products, and Plaintiffs were never disciplined for not selling or recommending products to guests. (SUF ¶¶ 86, 87.) Plaintiffs could have graduated without ever recommending a single product. (SUF ¶ 88.)

### d. *Plaintiffs Agree Practicing on Guests Was Beneficial*

Plaintiffs unanimously believe that that benefitted from practicing on guests. One Plaintiff stated that it was "important as part of [their] training," because, among other things, it provided them the "practice with strangers . . . [necessary to] be able to handle random people . . . [at] a job in a salon setting." (SUF ¶ 89.) Practicing in the clinic also exposed Plaintiffs to feedback, reactions to pain, and hair texture and color that only live people (as opposed to mannequins) can give. (*Id.*) Similarly, Plaintiffs testified that it was helpful to practice on customers who paid for the service, with one Plaintiff stating, "[p]aying for the service also ma[de] it feel more like a professional salon," and practicing on paying guests simulated the demands of paying customers in a real salon. (SUF ¶ 90.) Plaintiffs' skill levels, professionalism, and proficiency greatly improved due to the time they spent in the clinic, and they felt "prepared" to start work at a professional salon upon graduation. (SUF ¶ 91.)

School Defendants encouraged Plaintiffs to develop their future practice by bringing in guests to the clinic classroom. (SUF ¶ 92.) However, Plaintiffs were not required to bring in guests, nor were they disciplined for not doing so. (SUF ¶ 93.)

10

### 2. Plaintiffs Also Learned About Customer Service, Sanitation, Mixing and Dispensing Product

Consistent with NACCAS standards, School Defendants have established Advisory Boards.  (SUF ¶ 124.) These Boards have a membership that includes owners and representatives of salons, the potential future employers of the students. (*Id.*) The Advisory Boards provide feedback and insight into what skills School Defendants' students need to possess in order to be employable and successful after they graduate.  (SUF ¶ 125.)  The Advisory Boards have consistently highlighted the importance of students developing product knowledge, the ability to recommend and sell products, and customer service skills, in addition to the basic ability of being able to perform a cosmetological service.  (*Id.*)

To train Plaintiffs in the skills necessary to be successful in a professional salon, the School Defendants rotated Adaptive and Creative phase students, including Plaintiffs, to different parts of the clinic classroom—including the front door greeter, dispensary, color bar, and washhouse (collectively, "concierge stations")—so that Plaintiffs would experience all of the aspects of a "salon-like environment."  (SUF ¶ 94.)  The instructors were present and would step in "if there was something that was omitted that need[ed] to be done" in the concierge stations to keep the training environment operating for Plaintiffs' benefit.  (SUF ¶ 95.)

#### a. Front Desk Greeter

As part of the state-mandated curriculum, School Defendants taught Plaintiffs about the front desk activities so that they could learn about salon operations.  (SUF ¶ 96.)  Some Plaintiffs occasionally greeted guests as they entered the clinic classroom in order to develop guest service skills that would easily "apply in a [professional] salon setting."  (SUF ¶ 97.)

#### b. Dispensary, Washhouse, and Color Bar

Plaintiffs rotated through the dispensary portion of the clinic classroom, which is where Plaintiffs handled and learned about the "types of supplies you might find in

11

a salon" that students would use in the clinic.  (SUF ¶ 98.)  While in the dispensary, Plaintiffs would "package everything together for when it was time to use those products," including measuring and apportioning the proper amounts of products, as well as assisting with the sanitation of the tools used by the students.  (SUF ¶ 99.) Plaintiffs also rotated to the washhouse area of the clinic classroom, where they would ensure that the equipment used to wash guests' hair "is sanitary in regards to the bowls are wiped down, that the towels are stored in a sanitary fashion per state regulation," and that the towels were laundered appropriately, all of which provided training for future work in a professional salon.  (SUF ¶ 100.)  In addition, Plaintiffs rotated to the color bar, where "their [] learning assignment is to receive the tickets from a fellow student, review it with the fellow student, and then they actually mix the formula together and then give it back to the student, who then takes it back to their guest and performs the service."  (SUF ¶ 101.)

Plaintiffs engaged in concierge tasks infrequently as compared to their overall clock hours.  (SUF ¶ 102.)  In any event, no Plaintiff was ever punished for refusing to complete concierge tasks.  (SUF ¶ 103.)

### c.   *Sanitation and Cleanliness of Stations*

Instructors taught Plaintiffs to keep their assigned clinic stations and equipment clean, which included sweeping up their guests' hair in between haircuts as well as sanitizing and disinfecting their station and equipment.  (SUF ¶ 104.)  Cleaning and sanitization are critical skills for a cosmetologist in training because they are essential for public health and are tested on state cosmetology licensure exams.  (SUF ¶ 105.)

Plaintiffs did not take the place of janitors.  The Las Vegas School employed two full-time porters to perform all janitorial work, and the Fresno, East Bay and Sherman Oaks Schools engaged outside vendors of janitorial services that came twice per day to take out trash, clean the common areas and bathrooms, or "do whatever it takes to keep the facilities up and cleaned."  (SUF ¶¶ 106, 107.)  Plaintiffs may have occasionally swept common areas, wiped a counter, cleaned a few dishes, or taken

12

1  trash from a small garbage container to a larger garbage bin inside the building, either

2  voluntarily or if ever asked to do so.  (SUF ¶ 108.)  However, such occurrences were

3  infrequent, took minimal time, and were never required.  (*Id.*)  In any event, School

4  Defendants' policy at all times was for Plaintiffs to receive clock hours towards

5  graduation for any time that Plaintiffs ever performed such tasks.  (SUF ¶ 109.)

6  ### E.   **Plaintiffs' Graduation, Licensure, and Employment**

7          Each of the Plaintiffs successfully completed the necessary clock hours and the

8  statutorily required number of the various types of services required to graduate from

9  their respective schools.  (SUF ¶¶ 110–115.)  Upon graduating, Plaintiff Handcock

10  described "[a]ll of [her training]" as being beneficial, that the Fresno School had

11  "prepared" her to work in a real salon, and that most of her instructors "were really

12  [there] to help [her]."  (SUF ¶ 116.)  Overall, she rated the Fresno School as

13  "Excellent" in "Program Objectives Achieved," "Final Phase Preparation," "Job Entry

14  Level Skills Attained," and "Learning Leaders were Qualified and Helpful."  (*Id.*)

15  Similarly, Plaintiff Thomas described his experience at the Las Vegas School as

16  "definitely prepar[ing him] for the salon world," that he "[l]earned amazing tips and

17  tricks from everybody" at the school, and that "it's wonderful learning everything

18  from one huge brand such as Paul Mitchell, and there are wonderful teachers who

19  actually care about education."  (*Id.*)  Plaintiff Palominos stated she "definitely

20  enjoyed her training" at the East Bay School, thought the East Bay School "properly

21  prepared" her to work in a salon, and described her instructors as being "pretty cool"

22  and that "they did they're [sic] job on point."  (*Id.*)  Plaintiff Gerard stated on her

23  Graduate Survey that she received "great training and education." (*Id.*)  And finally,

24  Plaintiff Northrop stated in response to the Survey's query whether the Sherman Oaks

25  School properly prepared her for the salon, "Yes, yes, yes! Being on the floor prepared

26  me," "I loved taking real clients," and "When we are on the floor I learn the most

27  because it's where I made mistakes and learned from them."  (*Id.*)

28

1   Because Plaintiffs graduated from School Defendants' accredited programs,

2   they were eligible to take their state's licensure exam, which they had to pass before

3   they could work lawfully as cosmetologists.  (SUF ¶¶ 117, 118.)  Both the California

4   and Nevada cosmetology licensure exams consist of theoretical and practical

5   components.  (SUF ¶ 119.)  The CA and NV Boards tested Plaintiffs on various topics

6   meant to "protect the health, safety and welfare" of the public, including safe cutting

7   procedures, proper sanitation procedures, cleanup procedures, and setting up and

8   maintaining a clean working station.  (SUF ¶ 120.)

9   Plaintiffs Handcock, Palominos, Gerard and Northrop passed their state

10  cosmetology exams on the first attempt, and Plaintiff Thomas chose to take only half

11  of the exam, which he passed.  (SUF ¶¶ 121–122.)  All of the Plaintiffs received

12  assistance from the School Defendants' employment assistance programs, which

13  referred Plaintiffs to potential employers.  (SUF ¶ 123.)

14  ### III.   SUMMARY JUDGMENT STANDARD

15  Summary judgment shall be granted "if the movant shows that there is no

16  genuine dispute as to any material fact and the movant is entitled to judgment as a

17  matter of law."  Fed. R. Civ. P. 56(a).  To withstand summary judgment, a plaintiff

18  must present affirmative evidence; bald assertions of factual disputes are insufficient.

19  *Galen v. Cnty. of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007).

20  ### IV.   LEGAL ARGUMENT

21  The state-regulated education was provided to Plaintiffs by bona fide

22  educational establishments utilizing a state-mandated curriculum.[1]  California and

23

24  [1] For the duration of this case, all parties have repeatedly stipulated that the threshold

25  issue is "whether or not the *named* Plaintiffs are employees of the Defendants covered by the wage laws."  Order on Joint Stipulation to Extend Time to File

26  Motion for FLSA Conditional Certification and Class Certification [dkt. 24] (emphasis added); *see also* May 2, 2016 Order on Join Stipulation to Establish

27  Briefing Schedule [dkt. 117] (whether action continues depends on how "Court decides the motion(s) for summary judgment on whether Plaintiffs were

28  employees.").  Based on this understanding, discovery has been "focused on the individual claims of Plaintiffs."  [dkt. 24].  Accordingly, the issue before this Court

14

1  Nevada required the School Defendants to provide a minimum quota of "clock" hours

2  dedicated to enumerated topics, such as hairstyling, haircutting, health and safety

3  considerations, and disinfection and sanitation.  Cal. Bus. & Prof. Code §§ 7362–67;

4  Cal. Code Regs. tit. 16, § 950.1–.5; Nev. Rev. Stat. §§ 644.400; Nev. Admin. Code

5  §§ 644.115–.123; Cal. Code Regs. tit. 5, § 71720.  During Plaintiffs' enrollments, the

6  Las Vegas School was required to provide a 1800-clock hour education, and the

7  Fresno, East Bay and Sherman Oaks Schools were required to provide a 1600-clock

8  hour education covering a variety of service types.  Nev. Rev. Stat. § 644.200;  Cal.

9  Bus. & Prof. Code § 7362.5; Cal. Code Regs. tit. 16, § 950.2;.

10        By law, School Defendants were required to teach prescribed topics using both

11  theory and hands-on practical training.  Cal. Bus. & Prof. Code § 7362–67; Cal. Code

12  Regs. tit. 16, § 950.1–.5; Cal. Code Regs. tit. 5, § 71720;  Nev. Rev. Stat. §§ 644.400;

13  Nev. Admin. Code §§ 644.115–.123.  Moreover, School Defendants had lower

14  student-to-teacher ratios than those recommended and/or required by law.  *See, e.g.,*

15  Nev. Rev. Stat. § 644.395.  Under California and Nevada law, an individual cannot

16  legally work as a cosmetologist until she or he graduates from an approved school and

17  passes the state licensure exam.  Cal. Bus. & Prof. Code §§ 7317, 7321, 7349; Cal.

18  Code. Regs., tit. 16, §§ 909, 974; Nev. Rev. Stat. §§ 644.190(2)–(3), 644.200.

19        **A.     Plaintiffs' FLSA Claims Fail as a Matter of Law**

20        Plaintiffs carry the burden of proving they were employees under the FLSA.

21  *Purdham v. Fairfax County Sch. Bd.*, 637 F.3d 421, 427 (4th Cir. 2011).  Interpreting

22  whether an employer-employee relationship exists under the FLSA is a question of

23  law.  *See Gieg v. DRR, Inc.*, 407 F.3d 1038, 1045 (9th Cir. 2005); *see also Mark v.

24  Gawker Media LLC*, No. 13-CV-4347(AJN), 2016 WL 1271064, at *12 (S.D.N.Y.

25  Mar. 29, 2016) ("The existence and degree of each factor [of the analysis] is a

26  question of fact while the legal conclusion to be drawn from those facts—whether

27

28  _____

is narrow: whether the named Plaintiffs—and not other members of the putative class—were employees of the School Defendants.

1    workers are employees or [not]—is a question of law." (quoting *Brock v. Superior*
2    *Care, Inc.*, 840 F.2d 1054, 1059 (2d. Cir. 1988)).

3    **B.    *Portland Terminal's* Economic Reality Test Is Determinative**

4    The FLSA defines "employee" as "any individual employed by an employer,"
5    with the root word "employ" meaning "to suffer or permit to work."  29 U.S.C.
6    §§ 203(e)(1), (g).  As stated by the U.S. Supreme Court, this definition is "not
7    intended to stamp all persons as employees who, without any express or implied
8    compensation agreement, might work for their own advantage on the premises of
9    another.  Otherwise, all students would be employees of the school or college they
10   attended."  *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947).

11   In *Portland Terminal*, the Supreme Court held that railroad trainees were not
12   employees under the FLSA, recognizing that "[h]ad these trainees taken courses in
13   railroading in a public or private vocational school . . . it could not reasonably be
14   suggested that they were employees of the school within the meaning of the [FLSA]."
15   *Id.* at 152–53.  Since *Portland Terminal*, the Supreme Court has repeatedly instructed
16   that "economic reality" must determine whether an employment relationship exists.
17   *Tony & Susan Alamo Found. v. Sec. of Lab.*, 471 U.S. 290, 301 (1985); *Goldberg v.*
18   *Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)*; Rutherford Food Corp. v.*
19   *McComb*, 331 U.S. 72 (1947).

20   The Ninth Circuit, echoing the Supreme Court, has further emphasized that, in
21   evaluating the "economic reality," courts should consider "the totality of
22   circumstances."  *Hale v. Arizona*, 993 F.2d 1387, 1394 (9th Cir. 1993).  Notably, in
23   *Williams v. Strickland*, the Ninth Circuit relied on *Portland Terminal* and *Alamo* to
24   conclude that the "economic reality" test was most appropriate for determining
25   whether a temporary resident of a Salvation Army Rehabilitation Center was an
26   employee when he received clothing, food, and shelter, and weekly payment for
27   participation in a work therapy program.  87 F.3d 1064, 1067 (9th Cir. 1996). Using
28   this test, the Ninth Circuit affirmed the district court's grant of summary judgment to

16

the Salvation Army, which had explained that the totality of the circumstances revealed that the temporary resident did "not do the work of, or otherwise displace, [the Salvation Army's] regular employees" and that "[t]he benefit which the Salvation Army receive[d] from the work of the [plaintiff] is a small fraction of the cost of operating its programs." *Strickland*, 837 F.Supp. 1049, 1053 n.3, *aff'd* 87 F.3d at 1067. Accordingly, the district court concluded:

> In view of the economic realities and the totality of the circumstances, the basic relationship between the Salvation Army and plaintiff was not one of employment but of rehabilitation. The work element of the rehabilitation program was to give the beneficiaries a sense of worth, responsibility, and accomplishment, and was not used as a source of cheap labor for defendant.

837 F. Supp. at 1053 (N.D. Cal. 1993).[2]

The Northern District of California recently adopted similar reasoning when evaluating a motion for summary judgment in one of the Cosmetology Cases. *Benjamin v. B&H Educ., Inc.*, Case No. 13-cv-04993, 2015 WL 6164891 at *1 (N.D. Cal. Oct. 16, 2015), *appeal docketed*, No. 15-17147 (9th Cir. Oct. 28, 2015) The *Benjamin* court relied on the Second and Eleventh Circuits' comprehensive analysis of *Portland Terminal* in deciding whether unpaid interns are employees under the FLSA. *Id.* (agreeing with the "interpretation of *Portland Terminal* adopted by *Glatt* [] and *Schumann* [] for exactly the reasons stated in those cases.") *See Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528 (2d Cir. 2016); *Schumann v. Collier Anesthesia, P.A.*, 808 F.3d 1199 (11th Cir. 2015). Those courts agreed that the

---

[2] *Strickland* is just one in a long line of cases from the Ninth Circuit to apply the economic reality test to determine if an employment relationship exists. *See, e.g.*, *Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1324 (9th Cir. 1991) ("This circuit, in deciding if an employer-employee relationship exists, has applied an 'economic reality' test . . . . [which depends] upon the circumstances of the whole activity . . . .") (internal quotation marks and citation omitted); *see also Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983) (*abrogated on other ground by Garcia v. San Antonio Met. Transit Auth.*, 469 U.S. 528, 539 (1985)) (similar); *see also Hess v. Madera Honda Suzuki*, No. 1:10-cv-1821, 2012 WL 4052002, at *3 (E.D. Cal. Sept. 14, 2012) (recognizing *Gilbreath* and *Bonnette*).

1  appropriate test is to analyze the totality of the circumstances, which "accords courts

2  the flexibility to examine the economic reality [of the relationship]." *Glatt*, 811 F.3d

3  at 536; *see also Schumann*, 808 F.3d at 1209–10.  Interpreting the totality of the

4  circumstances, both courts determined the economic reality by analyzing "whether the

5  intern or the employer is the primary beneficiary of the relationship." *Glatt*, 811 F.3d

6  at 536; *see also Schumann*, 808 F.3d at 1203.[3]

7       *Glatt* and *Schumann* have been relied on by courts in addition to the *Benjamin*

8  court when assessing the economic reality of whether students are employees under

9  the FLSA by analyzing the totality of the circumstances to determine which entity—

10  the school or the student—received the primary benefit of the activity alleged to have

11  made the students employees.  *See, e.g., Hollins v. Regency Corp.*, __ F. Supp. 3d __,

12  No. 13 C 07686, 2015 WL 6526964 (N.D. Ill., Oct. 27, 2015) *appeal docketed*, 15-

13  3607 (7th Cir. Nov. 20, 2015) (analyzing factors from *Glatt* to determine cosmetology

14  students were primary beneficiary of performing services in clinic classroom, and thus

15  not employees); *Vlad-Berindan v. Metro. Transp. Auth.*, 14-cv-10304, 2016 WL

16  1271502, at * 7–9 (S.D.N.Y. March 31, 2016) (applying *Glatt* factors to find student

17  was not employee because "the clear economic reality of the relationship [was that]

18  the undisputed purpose of Plaintiff's internship was to fulfill academic requirement

19

20  _____

[3] In adopting the "primary beneficiary" test, both courts analyzed and expressly
21  rejected the U.S. Department of Labor's proposed six-factor test to determine
whether a student intern is an employee.  *See Glatt*, 811 F.3d at 535–36; *Schumann*,
22  803 F.3d at 1210.  The *Glatt* court explained that the DOL's factors are not entitled
to deference and are not persuasive because "the DOL test attempts to fit *Portland*
23  *Terminal*'s particular facts to all workplaces, and because the test is too rigid for our
precedent to withstand."  *Glatt*, 811 F.3d at 536.  The *Schumann* court adopted the
24  reasoning in *Glatt* verbatim, and then also explained "no circuit has adopted [the
DOL test] wholesale" and that the court "prefer[s] to take [its] guidance on this issue
25  directly from *Portland Terminal* and not from the DOL's interpretation of it."
*Schumann*, 803 F.3d at 1209.  Based on *Schumann* and *Glatt*, courts across the
26  country are similarly rejecting the DOL's six-factor test as "not a proper distillation
of *Portland Terminal*." *See, e.g., Berger v. Nat'l Coll. Athletic Ass'n.*, __ F. Supp. 3d,
27  __ 2016 WL 614365, at *9, 4–9 (S.D. Ind. Feb. 16, 2016); *Fraticelli v. MSG
Holdings, L.P.*, 13-civ-6518, 2015 WL 8491038, at *3–4 (S.D.N.Y. Dec. 10, 2015)
28  (recognizing and following *Glatt*'s rejection of DOL factors); *Klein v. Octagon, Inc.*,
14-cv-6770, 2015 WL 5821629 at *2 (S.D.N.Y. Sept. 30, 2015) (same).

18

1  for her bachelor's degree."); *Mark v. Gawker Media LLC*, 13-cv-4347, 2016 WL

2  1271064 (S.D.N.Y. March 29, 2016) (similar).

3        The reasoning of these more recent courts discussed above has long been

4  utilized by other earlier courts assessing similar circumstances.  Like the recent cases,

5  when courts find that the program or school at issue was legitimate and bona fide,

6  such that the economic relationship was one of student/school or intern/company, then

7  summary judgment was granted in favor of the alleged employer. *See also Steshenko*

8  *v. McKay*, No. C 09-5543, 2014 WL 494865 (N.D. Cal. Feb. 4, 2014) (applying

9  totality of circumstances analysis in granting summary judgment against students'

10  claim that hospital violated FLSA and California minimum wage laws because he

11  worked as unpaid intern as part of training at school); *Kaplan v. Code Blue Billing &*

12  *Coding, Inc.*, 504 Fed. Appx. 831, 834 (11th Cir. 2013); *Solis v. Laurelbrook*

13  *Sanitarium & Sch., Inc.*, 642 F.3d 518, 522 (6th Cir. 2011); *Blair v. Wills*, 420 F.3d

14  823, 829 (8th Cir. 2005); *Marshall v. Regis Educ. Corp.*, 666 F.2d 1324, 1326 (10th

15  Cir. 1981).  This was the case even when the students engaged in activities that were

16  traditionally work-type activities. *Laurelbrook*, 642 F.3d at 530–32 (students who

17  performed maintenance tasks, assisted with patients, sold flowers and produce,

18  repaired cars, and built wood pallets to be sold by school were not employees because

19  students were primary beneficiary of activities); *Blair*, 420 F.3d at 829 (students not

20  employees "[a]lthough having students perform chores helped defray certain costs

21  [defendant] would have incurred had they hired employees to perform those tasks.")

22      **C.**    <u>**Federal Courts Hold Cosmetology Students Are Not Employees**</u>

23        As noted *supra*, this case is one of the 21 nearly identical Cosmetology Cases

24  that were filed simultaneously across the country.  In the five Cosmetology Cases that

25  have reached a decision on the merits,[4] all of the district courts granted summary

26

27  _____

[4] To illustrate the overlapping nature of these cases, at least one of Plaintiffs' attorneys has been involved in four of the five cases that have reached a decision on the merits.

28

judgment against the students and concluded as a matter of law that the students were never employees of the schools.  *See Benjamin v. B&H Educ., Inc.*, Case No. 13-cv-04993, 2015 WL 6164891 (N.D. Cal. Oct. 16, 2015) (Chhabria, J.), *appeal docketed*, No. 15-17147 (9th Cir. Oct. 28, 2015); *Hollins v. Regency Corp.*, __ F. Supp. 3d __, No. 13 C 07686, 2015 WL 6526964 (N.D. Ill., Oct. 27, 2015) (Tharp, J.), *appeal docketed*, 15-3607 (7th Cir. Nov. 20, 2015); *Ortega v. Denver Inst. L.L.C.*, No. 14-cv-01351, 2015 WL 4576976 (D. Colo. July 30, 2015) (Hegarty, J.); *Jochim v. Jean Madeline Educ. Ctr. of Cosmetology, Inc*, 98 F. Supp. 3d 750 (E.D. Pa. 2015) (Dalzell, J.); *Atkins v. Capri Training Ctr., Inc.*, No. 2:13-cv-06820, 2014 WL 4930906 (D.N.J. Oct. 1, 2014) (Wigenton, J.).  In so holding, the district courts applied the U.S. Supreme Court's guidance in *Portland Terminal* and its progeny of cases—including *Glatt* and *Schumann*—to analyze whether an unpaid trainee is an employee under the FLSA based on the "economic reality" as viewed through the totality of the circumstances.  *Benjamin*, 2015 WL 6164891 at *1–2; *Regency*, 2015 WL 6526964 at *3–13;; *Ortega*, 2015 WL 4576976 at *13–17; *Jochim*, 98 F. Supp. 3d at *756–60; *Atkins*, 2014 WL 4930906 at *7–10. Because these cases involve nearly identical factual allegations and legal theories to those presented here, each of the cases is decidedly persuasive here.

### 1.   Northern District of California Concludes Cosmetology Students Are Not Employees in *Benjamin v. B&H Education*

*Benjamin* is the only Cosmetology Case within the Ninth Circuit to have reached a decision on its merits.  The *Benjamin* court "agreed with the interpretation of *Portland Terminal* adopted by *Glatt* [] and *Schumann* [] for exactly the reasons stated in those cases."  2015 WL 6164891 at *1 (citations omitted).  In so holding, the *Benjamin* court explained that "a court should look at all the circumstances to determine whether the relationship chiefly benefits the student or the entity for which the student is working."  *Id.  Benjamin* analyzed the economic reality and held that a

1  reasonable jury could not conclude that "the schools subordinated the educational

2  function of the clinics in favor of making money." *Id.* at 3–4.

3      In so concluding, the *Benjamin* court found that the students "cleaning up

4  around the clinic, doing laundry, [and] covering the phones . . . is relevant in preparing

5  for the [students'] chosen professions," and that the students' efforts not "allow[ the

6  school] to avoid employing janitorial staff." *Id.* at *3.  Moreover, the *Benjamin* court

7  explained that "[c]linical work is an essential part of these students' training—they

8  must log hundreds of clinical hours before qualifying for their licenses—so the mere

9  fact that the plaintiffs worked in a realistic salon environment isn't enough to show

10 that their work served a business purpose over an educational purpose."  Finally, the

11 *Benjamin* court found that "[w]orking on paying customers has obvious educational

12 value in preparing students for careers in which they will, in fact, be working on other

13 paying customers," and thus "the mere fact that the [clinic classroom] charge[s]

14 customers for services rather than offering them for free [does not] subordinate their

15 educational purpose." *Id.* at *3.

### 2.   Northern District of Illinois Concludes Cosmetology Students Are Not Employees in *Hollins v. Regency Corp.*

18     As the most recent of the Cosmetology Cases to issue a decision on the merits,

19 the *Hollins* court analyzed and adopted the *Glatt* and *Schumann* courts' interpretations

20 of *Portland Terminal*, concluding the primary beneficiary test is the appropriate

21 method for determining whether the economic relationship between the school and

22 students gave rise to an employer/employee relationship.  *Hollins*, 2015 WL 652694 at

23 * 3–6.  The *Hollins* court granted summary judgment against the students' claims

24 because Regency's students "were the primary beneficiaries of the arrangement that

25 allowed them to complete [the] legal requirement . . . of performing [the statutorily]

26 required training so that they could obtain [their] license[s]." *Id.* at *13.

27     In its analysis, the *Hollins* court concluded that the students did not expect to

28 receive compensation and did not expect employment with the school upon

graduation. *Id.* at *6–7, 11–12. Students received academic credit "for every minute of work they performed on the [clinic classroom] floor." *Id.* The *Hollins* court explained that "[a]ny benefit obtained by Regency is [] only derivative of the students' own benefit obtained from the [clinic classroom] floor," and "the mere fact that [a school] may have derived some economic value from [student activities] does not override the [students'] educational benefits and is not dispositive of the 'employee' issue." *Id.* (quoting *Marshall v. Regis Educ. Corp.*, 666 F.3d 1324, 1327 (10th Cir. 1981) and citing *Schumann*, 803 F.3d at 1211 ["Indeed there is nothing inherently wrong with an employer's benefitting from an internship that also plainly benefits the interns."]). Moreover, "the techniques the students practiced on paying customers were similar to those that they would have performed in a classroom setting." *Id.* at *6–7. The students were the primary beneficiaries of being required to "act as receptionists who interacted with customers, clean and sanitize the performance floor, sell salon product, and to restock cosmetology products as needed" because such topics were included on the state licensure exam, are necessary for students be successful in a professional salon, and are a necessary component of the school's curriculum pursuant to NACCAS accreditation and state regulations. *Id.*

The *Hollins* court concluded that the clinic classroom was tied to the academic calendar—including "required Saturday attendance [which] likely furthered the students educational goals [by] provid[ing] students with the greatest supply of customers and variety of experience possible"—and that the length of time spent in the clinic classroom did not exceed the statutory minimum number of hours necessary to graduate and be eligible to take the state licensure exam. *Id.* at *7–9. Moreover, Regency's student clinic did not displace any current or potential employees. *Id.* at *9–11. Finding an employment relationship based on Regency "outcompeting" licensed cosmetologists would "cut too deep (because it would effectively eliminate all student clinical services)." *Id.*

1    Finally, the *Hollins* court rejected the students' theory that Regency's alleged
2    profit from the clinic classrooms subordinated their education for two reasons: 1) the
3    revenue from the clinic classroom was not profit because it did not account for the
4    "substantial costs associated with operating the [clinic classroom]," and 2) even
5    assuming such a profit could be proven, "whether Regency made a profit off the
6    students' clinical work is largely irrelevant in the context of work performed by
7    student interns who are required by law to perform supervised clinical services in
8    order to graduate and obtain a professional license." *Id.* at *12.

9    **3.    District of Colorado Concludes Cosmetology Students Are Not Employees in *Ortega v. Denver Inst. LLC***
10

11    The *Ortega* court made extensive findings of fact that mirror—or, in many
12    ways, are more extreme than—the undisputed facts here. *Id.* at *1–8.  The *Ortega*
13    court concluded that, under *Portland Terminal*, the test for determining whether a
14    student was an employee was the "economic reality" of the relationship based on the
15    "totality of the circumstances." The *Ortega* court thoroughly examined the two
16    Cosmetology Cases that had already been decided on the merits—*Atkins* and *Jochim*,
17    discussed *infra*—and concluded that both decisions "represent good law."  *Ortega*,
18    2015 WL 4576976 at *13. The Court then used the DOL's six factors as guidance for
19    the analysis but noted that "no one factor [was] dispositive." *Id.* at *11–17.[5]

20    In its factual analysis, the *Ortega* court found persuasive that the cosmetology
21    school provided "the training one receives in an educational institution," and thus was
22    "in fact, a vocational school" rather than an employer. *Id.* at *13.  This conclusion
23    was bolstered by the facts that the defendant "provide[d] comprehensive classroom
24    and clinical-based education, which prepare[d] students for the licensures test," was
25
26    ---
    [5] The motion for summary judgment in *Ortega* was fully briefed without oral
27    argument prior to the issuance of the *Glatt* and *Schumann* decisions, and the *Ortega*
    docket does not reflect either party bringing the then-newly released *Glatt* decision
28    (the *Schumann* decision was released after the *Ortega* decision) to the attention of
    the *Ortega* court.

required by the state and its accreditor to have a clinical component, and that the students received federal aid only available to students. *Id.*  Moreover, the *Ortega* court concluded that practicing services in the clinic classroom "was for the benefit of" the students as it made them eligible to take the licensure exam, improved their skill set, and taught them valuable lessons on how to work with paying members of the public. *Id.* at *14.  The *Ortega* court likewise found that the students' "performance of 'janitorial' duties"—consisting of one hour after every shift in the clinic classroom cleaning their workspace and "classrooms, retail areas hallways, bathrooms, and break rooms" even though the school employed a janitorial staff—benefitted students because the state licensing board required students to receive "at least 180 hours of training in cleaning and disinfection" and the cleaning was "reasonably part of learning skills relevant to working in a salon." *Id.*  Moreover, the *Ortega* court found that "[s]elling products is an important part of work in a salon and knowing [one particular] product line helps students if they are employed [at that line's] salons." *Id.*  The *Ortega* court also concluded that the students did not—and could not—displace employees even when they supervised their peers as they progressed in their training. *Id.* at *15.

In rejecting the students' theory that the school benefitted financially from "free student labor," the *Ortega* court held that, even assuming the school profited from the clinics, the students were still "the main beneficiaries" of performing services on guests." *Id.* at *15–16.  Finally, the *Ortega* court considered that the students did not expect employment with—or compensation from—the school at any time during their tenure, either during the program or upon graduation. *Id.* at *16–17.

The *Ortega* court concluded as a matter of law that the students were never employees because "the undisputed material facts establish that Plaintiff went to [the school] as a student to meet the licensing requirements of Colorado, attended the school as a student, graduated as a student, and was never an employee." *Id.* at *17.

4.  **Eastern District of Pennsylvania Concludes Students Are Not Employees in *Jochim v. Jean Madeline Educ. Ctr. of Cosmetology***

The *Jochim* court granted summary judgment in favor of the school, concluding the economic reality was that the student was not an employee.  98 F.Supp.3d at 760.  The *Jochim* court held that "[t]he economic reality of the relationship was that Jochim paid the School tuition in exchange for an education in cosmetology, and a significant part of her education included working in Jean Madeline's clinic as a student."  *Id.* at 759.  In reaching its holding, the *Jochim* court reasoned that the plaintiff was a "student who participated in a realistic clinic mimicking an actual salon as part of her education," and the school's offering of a practical component aided her in honing customer service skills, retail skills, and sanitary practices (including "clean[ing] her work station and assist[ing] in keeping the clinic as a whole clean and sanitary" by, among other things, scrubbing sinks, cleaning mirrors, taking out the trash, and sweeping).  *Id.* at 754–55, 758.  *Jochim* further observed that, as would be typical in an educational program, the plaintiff performed increasingly complex tasks with increased independence.  *Id.*  The school's "alleged profit from its clinical program" did not change the court's analysis, as "[e]ven assuming . . . that Jean Madeline's clinic is profitable, that factor alone does not suffice to transform the economic reality . . . into one qualifying as employee/employer under the FLSA."  *Id.* at 759.  Nor did "[plaintiff's] mistaken impression from [school's] pre-enrollment statements, nor grousing with her fellow students that they should have been paid, change[] the economic reality for the relationship between [school] and [plaintiff]."  *Id.*

5.  **District of New Jersey Concludes Cosmetology Students Are Not Employees in *Atkins v. Capri Training Ctr., Inc.***

As the first court to issue a determination on the merits of the Cosmetology Cases, the *Atkins* court, in granting summary judgment, observed:

> The purpose of the [student clinic] is to mimic a real beauty salon.  The statutorily-mandated clinical program allows students to train under the instruction of a professional in a

25

1

2

3

4

5

6

7

> safe environment while affording students the chance to gain
> the experience and skills needed to succeed after graduation.
> The duties that [plaintiff] was required to perform at the
> [student clinic] are the same sorts of duties she may have to
> perform in a regular salon, and she has not argued to the
> contrary.  In fact, [plaintiff] herself attests to the fact that
> these duties were "essential and necessary" to the [student
> clinic's] continued operation.  Thus, these "janitorial,
> clerical, [and] logistical functions" may actually further the
> educational goals of the clinical program, the [State
> Cosmetology] Board, and [plaintiff] herself, by providing
> training for "essential and necessary" duties.

8   2014 WL 4930906, at *9.  The *Atkins* court also relied on the fact that the student was

9   "not economically dependent on the school, did not expect a job with the school or

10  degree of permanence, and had no expectation of being paid." *Id.* at *8.  The *Atkins*

11  court concluded:  "[t]he economic reality of the situation, along with the statutory

12  scheme in which the [student clinic] operates, demonstrates that [p]laintiff was merely

13  a student trainee" who "hone[d] her soon-to-be professional skills at a clinic." *Id.* at

14  *10.  Therefore, the "[p]laintiff was not entitled to coverage under the FLSA and . . . is

15  not entitled to wages for services performed at the [student clinic]." *Id.*

16          **D.      The Economic Reality Shows Plaintiffs Were Not Employees**

17          As discussed *supra*, the appropriate analysis is to examination of the totality of

18  the circumstances to determine the economic reality of which party was the primary

19  beneficiary.  To aid such a determination, the *Glatt* court provided—and the

20  *Schumann* court adopted—seven non-exhaustive factors for courts to consider as they

21  engage in the "flexible" process of "weighing and balancing all of the circumstances"

22  to determine the economic reality of which party—the student intern or the school—

23  received the primary benefit of the relationship.  *Glatt*, 811 F.3d at 536–37;

24  *Schumann*, 803 F.3d at 1212–13.  The *Glatt* factors are:

25              1. The extent to which the intern and the employer clearly
               understand that there is no expectation of compensation.
26              Any promise of compensation, express or implied, suggests
               that the intern is an employee—and vice versa.

27

28              2. The extent to which the internship provides training that
               would be similar to that which would be given in an

26

educational environment, including the clinical and other hands-on training provided by educational institutions.

3. The extent to which the internship is tied to the intern's formal education program by integrated coursework or the receipt of academic credit.

4. The extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar.

5. The extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning.

6. The extent to which the intern's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the intern.

7. The extent to which the intern and the employer understand that the internship is conducted without entitlement to a paid job at the conclusion of the internship.

811 F.3d at 536–537; *accord Schumann*, 803 F.3d at 1212–13 (adopting *Glatt* factors); *Hollins*, 2015 WL 652694 (same); *Benjamin*, 2015 WL 6164891 (approving of *Glatt* and *Schumann*).  "No one factor is dispositive and every factor need not point in the same direction for the court to conclude that the intern is not an employee entitled to minimum wage."  *Glatt*, 811 F.3d at 537; *see also Vlad-Berindan v. Metro. Transp. Auth.*, 2016 WL 1271502, at * 7–9 (S.D.N.Y. March 31, 2016) (multiple *Glatt* factors "point[ed] toward Plaintiff being an employee" but were "outweighed by the clear economic reality of the relationship: the undisputed purpose of Plaintiffs' internship was to fulfill academic requirement for her bachelor's degree")

Accordingly, each of the *Glatt* factors will be analyzed in turn to demonstrate the one economic reality:  Plaintiffs were the primary beneficiaries of their education.

**First (*Glatt* Factor Nos. 1 and 7):  Plaintiffs enrolled in the School Defendants' programs 1) knowing they were students,  and not employees,  2) not expecting payment of wages or benefits, 3) not expecting employment by School Defendants upon graduation, and 4) with no guarantee of employment at a professional salon after graduation.**  (SUF ¶¶ 23–25, 27–28).  Plaintiffs enrolled as

27

students for the purpose of pursuing a career in the cosmetology field, which required them to graduate from a state-approved cosmetology school. (SUF ¶¶ 6–7, 10, 13–19, 31; *accord* SUF ¶¶ 110–18, 121–23); *accord Portland Terminal*, 330 U.S. at 152; *Benjamin*, 2015 WL 6164891 at *3–4 (Plaintiffs "must log hundreds of clinical hours [at state approved school] before qualifying for their licenses."); *Hollins*, 2015 WL 6526964 at *11 (plaintiffs had no expectation of employment or benefits, and attended school to be eligible to take state licensure exam); *Ortega*, 2015 WL 4576976 at *14–17 (same); *Jochim*, 98 F.Supp.3d at 758; *Atkins*, 2014 WL 4930906, at *1, 8, 10; *see also Lane v. Carolina Beauty Sys., Inc.*, No. 6:90CV00108, 1992 WL 228868, at *4 (M.D.N.C. July 2, 1992); *Gawker Media LLC*, 2016 WL 1271064 at *9–10, 12.[6]

**Second (*Glatt* Factor No. 2):  School Defendants' clinic classrooms are an educational environment and directly related to a licensed and accredited educational program.** (*See, e.g.*, SUF ¶¶ 29–31, 34–54, 57–65, 70–78, 80–85, 89–91, 94–101, 104–05, 109–15, 117–18, 121–22.)  School Defendants are licensed to operate in California or Nevada and adhere to their respective state's statutory requirements. (SUF ¶¶ 4–12, 18–20.)  The School Defendants have also repeatedly been reviewed and accredited under the rigorous standards imposed by NACCAS. (*Id.* at ¶¶ 1–2.)  Accordingly, the School Defendants are "the sort of vocational school[s] where the students are required by law to be trained," and thus inherently meet this factor.  *Hollins*, 2015 WL 6526964 at *6–7; *see also Benjamin*, 2015 WL 6164891 at *3; *Ortega*, 2015 WL 4576976 at *13–14; *Jochim*, 98 F.Supp.3d at 753, 757; *Atkins*, 2014 WL 4930906 at *6, n.2; *Laurelbrook*, 642 F.3d at 520–21 (school curriculum was "approved of by the state accrediting agency"); *Lane*, 1992 WL 228868 at *3 ("All of [plaintiff's] activities at [defendant] during the relevant period were part of the mandated curriculum  . . . .  Moreover, [defendant] is an accredited

---

[6] Nevada prohibits the School from "advertis[ing] that its students will earn commissions, salaries or pay of any kind, other than gratuities, for services rendered." Nev. Admin. Code § 644.145.

1 vocational training school . . . ."); *Gawker Media LLC*, 2016 WL 1271064 at *9–10;

2 *Vlad-Berindan*, 2016 WL 1271502 at *8.

3     **Third (*Glatt* Factor No. 3):  Plaintiffs earned clock hours that qualified**

4 **them to take their states' licensure exams "for every minute that [they] were on**

5 **the clock," which included time spent learning sanitation, practicing a service on**

6 **a guest, discussing products with guests, and practicing concierge skills.**  (SUF

7 ¶ 30; *see also* 11, 18–20, 31, 65, 109, 111–15); *see also* Cal. Bus.& Prof. Code

8 §§ 7317, 7321, 7349; Cal. Code. Regs., tit. 16, §§ 909, 974; Nev. Rev. Stat.

9 §§ 644.190(2)-(3), 644.200.)  The fact the students received required clock hours for

10 every minute they spent on the clinic floor illustrates that the economic reality of the

11 relationship between the School Defendants and the students was that of a student-

12 trainer, and not an employee-employer.  *Hollins*, 2015 WL 6526964 at *7–8.");

13 *Benjamin*, 2015 WL 6164891 at *3; *Ortega*, 2015 WL 4576976 at *14–15; *Jochim*,

14 98 F.Supp.3d at 758–59; *Atkins*, 2014 WL 4930906 at *4, 9–10; *Kaplan*, 504 Fed.

15 Appx. at 835 (finding students were not employees, as training "benefitted Plaintiffs,

16 who received academic credit for their work and who satisfied a precondition of

17 graduation");  *Lane*, 1992 WL 228868 at *3 (stating cosmetology student not an

18 employee, but rather "a student pursuing an educational credential which would

19 allow her to advance her career"); *Vlad-Berindan*, 2016 WL 1271502 at *8 (The

20 "clear economic reality of the relationship [showed] the undisputed purpose of

21 Plaintiff's internship was to fulfill an academic requirement for her bachelor's

22 degree," even assuming she "learned nothing during her internship.").

23     **Fourth (*Glatt* Factor No. 4):  Plaintiffs' practicing of cosmetology skills in**

24 **clinic classrooms corresponded to the academic calendar.**  (SUF ¶¶ 18–19

25 [programs were 1600 or 1800 clock hours, following academic calendar], 22

26 [enrollment contracts and catalogs], 45–46 [length of Core phase], 50 [length of

27 Protégé phase], 54, 56 [length of Creative and Adaptive phase], 62 [length of final

28 phase]). State law required Plaintiffs  to receive practical training in clinic classrooms,

and their time doing so was tied to the clock hour requirement of each state.  (SUF ¶ 1–11, 18–20, 31, 65, 109, 111–15.)  As such, Plaintiffs' "time on the [clinic] floor was integrated into the rest of [their] cosmetology curriculum, indicating that [their] practical training tracked the academic calendar."  *Hollins*, 2015 WL 6526964 at *8; *see also Glatt*, 791 F.3d at 384; *Schumann*, 803 F.3d at 1212; *Gawker Media LLC* , 2016 WL 1271064 at *10; *Vlad-Berindan*, 2016 WL 1271502 at *8.  Moreover, "required Saturday attendance likely furthered the students educational goals, as it provided students with the greatest supply of customers and variety of experience possible."  *Hollins*, 2015 WL 6526964 at *8; (SUF ¶ 61) (Saturdays provided Plaintiffs the most opportunities to practice their skills on paying guests and "mimic[ed] the salon schedules [Plaintiffs] are going to be expected [to work] when they graduate[d] school.").

**Fifth (*Glatt* Factor No. 5):  Plaintiffs' practicing of cosmetology skills in the School Defendants' clinic classrooms was limited to the time period during which they received beneficial training.** (*Compare* SUF ¶¶ 18–20 [statutorily required length of program] *with* ¶¶ 110–15 [Plaintiffs' graduated upon completion of those hours].)   The CA and NV Boards required Plaintiffs to successfully complete 1600 and 1800 clock hours, respectively, at an approved school in order to be eligible to take that state's licensing exam.  (*Id.*) The School Defendants did not require Plaintiffs to participate in their programs longer than was necessary to complete that requirement.  *Id.*; *accord Hollins*, 2015 WL 6526964 at *9 (noting Regency's 1500-hour requirement was consistent with the students' educational goals).  The School Defendants even incentivized Plaintiffs via a per-hour overtime charge to ensure they progressed through their programs timely and graduated within the prescribed period of time.  (SUF ¶¶ 21–22.)  As such, School Defendants' programs match exactly the state requirements, and do not constitute the "grossly excessive" duration of an internship that is the target of this factor.  *Schumann*, 803 F.3d at 1213–14.  In any event, Plaintiffs agreed practicing services in the clinic was "important as part of

30

[their] training," as it taught them customer service skills and enabled them to practice on strangers who were paying for the services.  (SUF ¶¶ 89; *accord* SUF ¶¶ 55, 77, 84, 116.)  Similarly, Plaintiffs benefitted with every service they performed by learning and honing those skills necessary to pass the licensure exam and to be successful as a professional cosmetologist.  (SUF ¶¶ 35–36, 91; *see generally* 55, 77, 84, 89, 100, 111–18, 121–22.)

**Sixth (*Glatt* Factor No. 6): Plaintiffs did not displace employees.**  The School Defendants' employees' primary focus was on the instruction of Plaintiffs, (*see, e.g.*, SUF ¶¶ 12, 32–34, 38–41, 49, 52, 62, 64, 74–84), but they also managed all of the day-to-day operations of the clinics, including the clinics' front desk, managing inventory, cleaning, selling of products, and scheduling appointments, (SUF ¶¶ 70–71, 95.)  Moreover, the School Defendants employed or engaged janitors to regularly take out all trash, clean the common areas and bathrooms, clean color bowls, do the laundry, etc.—basically, "do whatever it takes to keep the facilities up and cleaned." (SUF ¶ 95, 106–107.)

Plaintiffs learned and practiced sanitation skills in the clinic, including keeping stations and equipment clean and sweeping the floor around their station between haircuts.  Such skills are essential for public health, are critical for success as a cosmetologist, and are tested on state licensure exams.  (SUF ¶¶ 11, 36, 94, 98–101 104–105, 111–22.)  Plaintiffs did not displace any paid employee—either as an instructor, receptionist, or janitor—by practicing their sanitization and concierge station skills.  *Accord Benjamin*, 2015 WL 6164891 at *3 (concluding alleged non-cosmetological work  was "relevant in preparing [students] for [their] chosen professions" and was not "so extensive that it allowed [school] to avoid employing janitorial staff"); *Hollins*, 2015 WL 6526964 at *9–11 (similar); *see also Kaplan*, 504 Fed. Appx. at 835 (students "did not displace Defendants' regular employees"); *Laurelbrook*, 642 F.3d at 530 (same); *Marshall*, 666 F.2d at 1327 (same); *Lane*, 1992

31

1   WL 228868 at *2 ("Plaintiff's presence in the school did not displace any employee of

2   [the school].").

3          Moreover, courts have unanimously rejected the allegation that students

4   displaced the licensed cosmetologists that School Defendants would have had to have

5   hired in order to operate the clinic if they did not have students.  *See, e.g.*, *Hollins*,

6   2015 WL 6526964 at *9–11; *Laurelbrook*, 2009 WL 2146230 at *3 *aff'd*, 642 F.3d

7   518, 530 (6th Cir. 2011).  In doing so, courts have found persuasive the fact that

8   schools "train[ing] future cosmetologists [are] not in the business of hiring licensed

9   cosmetologists to work on the [clinic classroom] floor[, which] exists only because it

10  is needed to train students."  *Hollins*, 2015 WL 6526964 at *9. Moreover, the School

11  Defendants are prohibited by California and Nevada law from employing licensed

12  cosmetologists to perform services, (SUF ¶ 105, *see also* Nev. Rev. Stat.

13  § 644.190(2)–(3), 644.200; Cal. Bus. & Prof. Code § 7317, 7321, 7349,  Cal. Code.

14  Regs., tit. 16, §§ 909, 974), thereby "making it legally impossible for students to

15  displace any potential employees," *Hollins*, 2015 WL 6526964 at *10; *see also*

16  *Ortega*, 2015 WL 4576976 at *15.

17         Finally, courts have rejected the argument that cosmetology schools unfairly

18  compete with professional salons by provided similar services for cheaper.  *See, e.g.*,

19  *Hollins*, 2015 WL 6526964 at *9–11.  As explained in *Hollins*, Plaintiffs' position

20  "would cut too 'broad [a] swath' [because] [a]ny clinical program in which students

21  perform services might displace business from ordinary commercial endeavors

22  operating in the same market."  *Id.* (quoting *Vanskike v. Peters, III*, 974 F.2d 806, 811

23  (7th Cir. 1992)).  The Ninth Circuit has rejected this overly broad tenet, explaining

24  that "nothing in the FLSA indicates that [unfair competition] alone should convert the

25  relationship . . . [into] one of employer-employee."  *Hale*, 993 F.2d at 1397.[7]

26

27  ────────────────
    [7] Recognizing the internal inconsistency in Plaintiffs' arguing that they displaced
    employees as well as advocating for the School Defendants to not charge guests for
28  services, the *Hollins* court aptly noted "charging no fee would presumably result in
    **more** market displacement."  *Id.* at *10.

1    Thus, each School Defendant's student clinic "does not displace any current

2    employees (because *it does not have any*), it does not displace any potential

3    employees (because *it is forbidden from having any*), and finding an employment

4    relationship based on a [School Defendants] 'outcompeting' licensed cosmetologists

5    would cut too deep (because *it would effectively eliminate all* student clinical

6    services)." *Hollins*, 2015 WL 6526964 at *11.

7    <u>**In sum, Plaintiffs admit that they received immediate and meaningful**</u>

8    <u>**benefits from participating in the student clinics.**</u>  Plaintiffs agree that their ability

9    to practice on live people in the clinic was "necessary" to their development as future

10   cosmetologists, and that their skill levels and proficiency greatly improved due to the

11   training they received in the clinic.  (SUF ¶¶ 89–91.)  Beyond developing their

12   techniques, Plaintiffs' practical training taught them numerous skills that all parties

13   agree were necessary to be employable after graduation.  (*See, e.g.*, SUF ¶¶ 33, 35–36,

14   84, 89–91, 94, 98, 100.)  For example, interacting with guests taught them the vital

15   skills of client service that are "part of creating the ambiance to make a person feel

16   welcome" that would easily "apply in a [professional] salon setting." [8]  (SUF ¶ 97.)

17   Similarly, their rotation in the dispensary taught them the skill of understanding tools

18   and products, skills that are tested on as part of state licensure exams.  (SUF ¶¶ 34, 36,

19   84, 94, 98–99, 120, 121–22.); *see also* Cal. Code Regs. tit. 16, §§ 940–950.10; Nev.

20   Admin. Code § 644.115–.123.)  Finally, Plaintiffs learned and practiced proper

21   cleaning and sanitizing techniques, both of which are tested in the state licensure

22   exams, are essential to safeguard public health and for successful employment as a

23   cosmetologist.  (SUF ¶¶ 11, 36, 94, 98–101 104–105, 111–22; *see also* Cal. Bus. &

24   _____

[8] The CA Board "recommends that schools provide training in the area of
25   communication skills that includes professional ethics, salesmanship, decorum,
record keeping, and client service records," *see* Cal. Code Regs. tit. 16, §§ 950.2.
26   The Nevada Cosmetology Act requires each cosmetology school to "[i]nclude in its
curriculum a course of deportment consisting of instruction in courtesy, neatness,
27   and professional attitude in meeting the public" and requires them to include in their
curriculum "[r]eception desk training."  Nev. Rev. Stat. § 644.400*; see also* Nev.
28   Admin. Code § 644.115–.120.

1   Prof. Code § 7338; Cal. Code Regs. tit. 16, §§ 978–995; Nev. Rev. Stat. §§ 644.240–

2   .248; Nev. Admin. Code §§ 644.335–.372.)

3        In addition to state law codifying and testing all of the aforementioned skills,

4   the Department of Labor, the CA and NV Boards, and the School Defendants'

5   Advisory Boards, made up largely of salon owners, determined these skills to be

6   essential for a student to possess in order to become employable in a professional

7   salon.  (SUF ¶¶ 124–25.)  Courts similarly concluded this factor weighs in favor of a

8   student/school relationship.  *See, e.g.*, *Jochim*, 98 F.Supp.3d at 758 (school provides

9   "realistic clinic in which students can practice treatments and hone customer service

10  skills, retail skills, and sanitary practices as [state] law requires"); *Ortega*, 2015 WL

11  4576976 at *14–15 (students benefitted from practicing services, sanitation skills, and

12  retail recommendations); *Hollins*, 2015 WL 6526964 at *6–7 (similar); *Benjamin*,

13  2015 WL 6164891 at *3 (similar);  *Atkins*, 2014 WL 4930906 at *9 ("[C]linical

14  program . . . afford[ed] students the chance to gain the *experience and skills they*

15  *need[] to succeed after graduation*."); *Laurelbrook*, 642 F.3d at 531; *Gawker Media*

16  *LLC*, 2016 WL 1271064 at *9–10; *Vlad-Berindan*, 2016 WL 1271502 at *8.

17       Because the totality of the circumstances demonstrates that the economic reality

18  that Plaintiffs were not employees of the School Defendants, Plaintiffs' claims

19  pursuant to the FLSA fail as a matter of law.

20       **E.     Plaintiffs' Claims Under California Law Fail as a Matter of Law**

21       Plaintiffs were not "employees" according to California statutes, long-standing

22  appellate precedent, and the published guidance offered by the California Division of

23  Labor Standards Enforcement ("DLSE").  California Industrial Welfare Commission

24  ("IWC") Wage Order No. 2-2001, § 2(D), Personal Service Industry applies to

25  employees of beauty schools.  *Id.* at § 2(J).  "Employ" means to "engage, suffer, or

26  permit to work."  *Id.* at § 2(D).  "Employee" means any person employed by an

27  employer, and includes any lessee who is charged rent, or who pays rent for a chair,

28  booth, or space.  *Id.* at § 2(E).  "Employer" means any person who directly or

34

indirectly employs or exercises control over the wages, hours, or working conditions of a person.  *Id.* at § 2(F).

### 1. Plaintiffs Were Not Employees Under California Statutory Law

The Barbering and Cosmetology Act in relevant part states:

> Except as provided in this article, it is unlawful for any person, firm, or corporation to engage in barbering, cosmetology, or electrolysis for compensation without a valid, unexpired license issued by the board, . . . . Persons licensed under this chapter shall limit their practice and services rendered to the public to only those areas for which they are licensed.  Any violation of this section is subject to an administrative fine and may be subject to a misdemeanor.

Cal. Bus. & Prof. Code § 7317.  However, "[s]tudents engaged in performing services on the public while enrolled in a school approved by the board shall not be required to be licensed under this chapter if they perform those services at the approved school in which they are enrolled."  *Id.* § 7319.5.  Based on this statute, the CA Board has taken the position that students are not permitted to receive pay for services in the clinics because they are unlicensed and remuneration would be an unlicensed practice of cosmetology.  (Vogelzang Decl. Ex. K.)  Violations would result in students being fined and schools being subject to citation, fines, and misdemeanor charges.  *See, e.g.*, Cal. Bus. & Prof. Code §§ 7317, 7349, 7402–08; 16 Cal. Code Regs. §§ 974, 976.

### 2. Plaintiffs Were Not Employees under California Case Law

Long-standing California appellate precedent also holds that cosmetology students are not employees.  In *Hutchison v. Clark*, the California Courts of Appeal analyzed the cosmetology statute in deciding whether students attending cosmetology schools are employees.  153 P.2d 796 (Cal. Ct. App. 1944).  *Hutchison* was brought after the IWC issued an order that required the payment of wages to beauty school students during the last 350 hours of a required 1600 hour course.  *Id.* at 797–99.  The appellate court held that, "The fact that 'the school purchases (in exchange for tuition) and markets to the public, the services of the student,' establishes no such

35

1 [employment] relation," and to hold otherwise "would in effect modify the statute."

2 *Id.* at 799.

3     *Hutchison* is binding precedent in California.  First and foremost, federal courts

4 "must defer to the California Court of Appeal's interpretation [of a statute] unless

5 there is convincing evidence that the California Supreme Court would decide the

6 matter differently."  *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1099 (9th

7 Cir. 2003).  *Hutchison* has been good law in California since 1944, has received no

8 criticism or negative treatment by another California state court, accords the

9 Cosmetology Act, has been cited with approval by the DLSE as recently as 2010,

10 (SUF ¶109 ), and was adopted "complete[ly]" by at least one other state's supreme

11 court, *Ind. Comm'n v. Am. Beauty College, Inc.*, 447 P.2d 531, 533 (Colo. 1968).

12     Federal courts have cautioned that *Hutchison* may no longer exempt as a matter

13 of law cosmetology students from Wage Order 2 based on the California Supreme

14 Court's ruling in *Martinez v. Combs*, 49 Cal.4th 35 (Cal. 2010),which addressed joint-

15 employer liability.  *See Ford v. Yasuda, et al.*, No. 13-1961, 2014 WL 9887277 (C.D.

16 Cal. July 30, 2014); *Benjamin*, 2015 WL 6164891 at *2, n.1 (agreeing with *Ford*).

17     However, the *Ford* court, ruling on a 12(b)(6) motion, ignored the plain

18 language of the Cosmetology Act when it concluded that the Act was "silent as to

19 whether students must or may be compensated for work they perform within their

20 cosmetology school." *Id.* at *4.  This conclusion contradicts the Act's express

21 prohibition of any unlicensed person being employed as a cosmetologist.  Cal. Bus. &

22 Prof. Code § 7349.  Moreover, the *Ford* court failed to recognize that *Martinez* did

23 not—but could have—abrogated *Hutchison*, a fact particularly poignant because the

24 *Martinez* court expressly abrogated the holdings of three other cases.  *Martinez*, 49

25 Cal.4th at 65–66.  In any event, the *Ford* order is not controlling here because the

26 "opinions of other federal judges on a question of state law do not constitute

27 'convincing evidence' that the state supreme court would decide [an issue]

28 differently." *Ryman v. Sears, Roebuck and Co.*, 505 F.3d 993, 995 n.1 (reversing

district court that followed federal court orders rather than state intermediate court's

holding) (alterations in original) (citation and internal quotation marks omitted).

### 3. California Labor Commissioner Guidance Confirms Plaintiffs Were Not Employees

The IWC has confirmed—repeatedly, recently, and conclusively—that students

at cosmetology schools are not employees. The *Benjamin* Court invited the California

Labor Commissioner on two occasions to share her view of the viability of *Hutchison*,

but she did not do so. *Benjamin*, 3:13-cv-04993-VC [dkt 52] (N.D. Cal.) The silence

may be because multiple publications from the DLSE already describe its position.

In addressing whether interns are employees, the DLSE has, for more than 15

years, "followed federal interpretations" of the FLSA, *Portland Terminal*, and its

progeny of cases, and thus analyzed and adopted the economic reality test based on a

totality of the circumstances to determine whether an unpaid intern is an employee.

(SUF ¶107, 108, 109.) The DLSE's most recent related opinion was written before

*Glatt* and *Schumann* and is thus of dubious guidance. In a April 7, 2010 Opinion

Letter, the DLSE moved from an 11-factor analysis[9] to adopt the DOL's 6-factor

test—which had not yet been rejected by *Glatt* and *Schumann* and thus was the best

statement of federal law at that time—and noted that no one factor has ever been

dispositive.[10] (Vogelzang Decl. Ex. L.)

In applying the DOL factors, the DLSE concluded that the internship in

question was "a continuation of the learning and development phase with both phases

---

[9] The DLSE's May 17, 2000 opinion letter examined numerous factors to determine the "economic reality" of the relationship of externs placed for 18 weeks with restaurants "to acquire practical experience as part of a continuation of their formal education." (Vogelzang Decl. Ex. M) The DLSE concluded no employment relationship would exist if the extern performed tasks directly pertinent to his or her education, was closely supervised, and did not displace regular workers. (*Id.* at p. 2-4.)

[10] In light of *Glatt* and *Schumann*, the DLSE would likely reject the DOL factors and instead look to the *Glatt* factors and any other factors that were relevant to determine the economic reality. As such, the School Defendants' FLSA Factors discussed *supra* would apply equally to Plaintiffs' California law claims.

37

1  developing individual discipline, basic job skills, and applied knowledge in computer
2  technology," and noted that "[t]he training appears to provide educational experiences
3  not typically available in the classroom and similar to a vocational school." (*Id.* at
4  *8.) The DLSE stated that "where there is a 'predominant' benefit to the student,
5  there is generally no employment relationship, and explained that "the key language in
6  [the benefit to the employer] criterion is whether the advantage or benefit the
7  employer receives is *immediate*." (*Id.* at 12.) Accordingly, the DLSE opined that
8  "[w]here the training activities involved increased responsibility near the end of the
9  training but trainees are still supervised throughout the period and do not assume the
10 duties of regular workers, there is no immediate benefit to the employer." *Id.*

11      Federal courts have applied the "approach of the DLSE in th[e] April 7, 2010
12 Opinion Letter]" in the trainee context  because "the DLSE reasonably adopted the
13 DOL/*Portland Terminal* test." *Harris v. Vector Mktg. Corp.*, 753 F.Supp.2d 996,
14 1013–14 (N.D. Cal. 2010). Moreover, the *Benjamin* court looked to the DLSE's
15 "'histor[y of] follow[ing] federal interpretations' in determining whether 'trainees and
16 interns] are employees under California law." *Benjamin*, 2015 WL 6164891 at *2
17 (quoting DLSE Opinion Letter dated April 7, 2010 (Vogelzang Decl. Ex. L.)). In
18 doing so, the *Benjamin* court expressly rejected *Martinez*'s "control" test for
19 determining an employee/employer relationship as it relates to cosmetology students,
20 stating that "it makes no sense to extend [the *Martinez*] employee/ independent
21 contractor test to the educational context." *Id.*

22      Accordingly, to the extent the IWC general intern factor test controls, the
23 School Defendants' analysis of the FLSA Factors *supra* precludes as a matter of law
24 the conclusion that Plaintiffs were employees of the School Defendants. *See, e.g.*,
25 *Jackson v. AEG Live, LLC*, 183 Cal. Rptr. 3d 394, 413–15 (2015) ("Even if one or two
26 of the individual factors might suggest an employment relationship, summary
27 adjudication is nevertheless proper when, as here, all the factors weighed and
28 considered as a whole establish [otherwise] as a matter of law.")

1      Other sources from the DLSE confirm its position.  Section 43.6.8 of the

2  DLSE's Enforcement Policies and Interpretations Manual states:  "*Students who*

3  *perform work in the course of their studies, as part of the curriculum, are not*

4  *employees if they receive no remuneration or credit toward school fees*."  (Vogelzang

5  Decl. Ex. N) (emphasis added).[11]  Also, the DLSE has advised that "[s]tudents in

6  schools of beauty culture offering beauty care to the public for a fee" are exempt from

7  Wage Order No. 2.  (Vogelzang Decl. Ex. O.)

8      Based on the foregoing, Plaintiffs' California claims fail as a matter of law.

9      **F.**    **Plaintiff's Claims Under Nevada Law Fail as a Matter of Law**

10      As a preliminary matter, Nevada expressly precludes cosmetology students

11  from being considered employees while practicing their skills on guests in a school's

12  clinic classroom.  Under Nevada law, "it is unlawful for any person to engage in . . .

13  the practice of cosmetology . . . unless the person is licensed."  Nev. Rev. Stat.

14  § 644.190. That prohibition has a narrow caveat where it does not apply to "[a]ny

15  student in any school of cosmetology . . . from engaging, **in the school and as a**

16  **student**, in work connected with any branch . . . of cosmetology in the school."  Nev.

17  Rev. Stat. § 644.190(3)(a) (emphasis added).  As such, Nevada law only permits

18  students to practice their skills on members of the public "as a student."  Any other

19  relationship, such as an employee, violates Nev. Rev. Stat. § 644.190.

20      Moreover, Nevada has "adopt[ed] the FLSA's economic realities test for

21  employment in the context of Nevada's minimum wage laws.  *Zuri-Kinshasa Maria*

22  *Terry v. Sapphire/Sapphire Gentlemen's Club*, 336 P.3d 951, 958, 958–61(2015)

23  (analyzing non-exhaustive list of typical factors).  Accordingly, Plaintiffs' claims

24  pursuant to Nevada law fail for the same reasons they fail under the FLSA.

25

26  [11] Although students are not interns, section 46.6.6 of the DLSE Manual notes that interns, like students, are "exempt from the wage and hour requirements of the IWC

27  Orders [if] the intern's training . . . is an essential part of an established course of an accredited school or of an institution approved by a public agency to provide

28  training for licensure or to qualify for a skilled vocation or profession."  (Vogelzang Decl. Ex. N.)

## V.   <u>CONCLUSION</u>

Analyzing the uncontroverted facts to determine the economic reality can only lead to the conclusion that Plaintiffs were the primary beneficiaries of their training in the clinic classrooms.  Thus, Plaintiffs were only students, and never employees, of the School Defendants.  Because the determination that Plaintiffs were never employees is fatal to all of their claims, the School Defendants respectfully request that this Court grant summary judgment in their favor and dismiss with prejudice Plaintiffs' First Amended Complaint in its entirety.

Dated:  June 2, 2016                                      **DUANE MORRIS LLP**

By:/s/ Julie A. Vogelzang____
    Julie A. Vogelzang
    Lisa Hird Chung
    Bryce Young
    Attorneys for Defendants John Paul Mitchell
    Systems, Von Curtis, Inc., P.M. Advanced
    Education, Inc., Paul Mitchell Advanced
    Education LLC, PMNV Las Vegas, LLC,
    PMCA Bakersfield, LLC, PMHBW LLC,
    D'Ann Evans, Ann Marie Safadi, Winn
    Claybaugh, and John Paul DeJoria

Dated: June 2, 2016                                      **GORDON & REES, LLP**

By:/s/ Susanna Ryan Matingou
    Gina Haggerty Lindell
    Susanna Ryan Matingou
    Attorneys for Defendants P2W Learning
    Systems, LLC and Paul Mantea

ECF ATTESTATION

Pursuant to Local Rule 5-4.3.4(a)(2)(i), the filer attests that all other signatories listed, on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.