DAVID A. LOWE (SBN: 178811)
Email: dal@rezlaw.com
CHAYA M. MANDELBAUM (SBN: 239084)
Email: cmm@rezlaw.com
MICHELLE G. LEE (SBN: 266167)
Email: mgl@rezlaw.com
**RUDY, EXELROD, ZIEFF & LOWE LLP**
351 California Street, Suite 700
San Francisco, CA  94104
Telephone: (415) 434-9800
Facsimile:  (415) 434-0513

Attorneys for Individual and Representative
Plaintiffs CLAIRE GERARD, *et al.*, and all others
similarly situated

[*Additional Counsel of Record listed on next page*]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLAIRE GERARD, an individual and all others similarly situated, | Case No. 2:14-cv-04999-DSF (JC) |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT RE: EMPLOYMENT** |
| v. | |
| JOHN PAUL MITCHELL SYSTEMS, a California Corporation, *et al.*, | Date:    July 25, 2016 |
| Defendants. | Time:    1:30 p.m. |
| | Place:   Courtroom 1 |
| | Judge:  Hon. Dale S. Fischer |
| | Consol. Compl. Filed:  Sept. 29, 2014 |
| | Trial Date:  March 14, 2017 |

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**Additional Counsel for Plaintiffs**

LEON GREENBERG (SBN: 226253)
Email: leongreenberg@overtimelaw.com
DANA SNIEGOCKI (SBN: 261212)
Email: dana@overtimelaw.com
**LAW OFFICE OF LEON GREENBERG**
2965 South Jones Boulevard #E-4
Las Vegas, NV  89146
Telephone: (702) 383-6085
Facsimile:  (702) 385-1827

LEE R. FELDMAN (SBN: 171628)
Email: lee@leefeldmanlaw.com
ALICIA OLIVARES (SBN: 181412)
Email: alicia@leefeldmanlaw.com
LEONARD SANSANOWICZ (SBN: 255729)
Email: leonard@leefeldmanlaw.com
**FELDMAN BROWNE OLIVARES, A Professional Corporation**
10100 Santa Monica Blvd., Suite 2490
Los Angeles, CA  90067
Telephone: (310) 552-7812
Facsimile:  (310) 552-7814

BRYAN J. SCHWARTZ (SBN: 209903)
Email: bryan@bryanschwartzlaw.com
**BRYAN SCHWARTZ LAW**
1330 Broadway, Suite 1630
Oakland, CA  94612
Telephone: (510) 444-9300
Facsimile:  (510) 444-9301

# **TABLE OF CONTENTS**

**Page(s)**

I.    INTRODUCTION ................................................................................... 1

II.   STATEMENT OF RELEVANT FACTS .............................................. 3

     A.    Defendants' Schools Are Designed to Make a Profit and Support the Paul Mitchell Brand. ......................................................................... 3

     B.    Revenue from Students' Services and Sales Contributed Significantly to Defendants' Profitability and Is a Primary Focus of Defendants' System for Operating the Schools............................................................ 4

     C.    Paul Mitchell Schools' Sales and Service Systems Are Designed to Generate Money for the Schools, Not Further Plaintiffs' Education. ........ 8

          1.    Student-Employees Are Required to Serve Paying Customers, Rather than Practice the Variety of Procedures Required for the Exam and Future Success as a Professional. .................................... 8

          2.    Paul Mitchell Schools, Not Student-Employees, Benefit From the Sale of Cosmetology Services. ......................................................... 9

          3.    Student-Employees Are Required to Perform Many Hours of Manual Labor With No Educational Benefit.................................. 10

          4.    The "Students" Receive Minimal Educational Supervision in Defendant's Salons. ...................................................................... 12

          5.    Defendants Require "Students" to Sell Paul Mitchell Products, Including Pet Products Unrelated to Their Education. ................... 13

     D.    Defendants Control the Wages, Hours, and Working Conditions of the "Student"-Salon Workers, Suffering and Permitting Unpaid Work......... 14

     E.    Plaintiffs Were Unprepared to Take the Licensing Exam and for Work in Professional Salons. .................................................................. 14

F.    Defendants' Use of Plaintiffs' Unpaid Labor Allows Defendants to Compete Unfairly. ..................................................................... 15

III.   LEGAL ANALYSIS AND ARGUMENT ........................................... 16

A.    Standard of Review ................................................................... 16

B.    Plaintiffs Are Entitled to The Full Employment Status Inquiries Under State and Federal Law As There Is No Categorical Exclusion of Cosmetology Students. .............................................................. 17

C.    Plaintiffs Are Employees Under the FLSA ............................... 18

1.    Under *Portland Terminal* and the Economic Realities Test, Plaintiffs are Employees Under the FLSA. .................................................... 19

2.    The Court Should Apply the DOL's Six-Factor Test, Derived from *Portland Terminal,* Which Supports a Finding that Plaintiffs Are Employees. .......................................................................... 22

i.    Plaintiffs' Unpaid Labor in Defendants' Salons Confers an Immediate Economic Benefit on Defendants. ....................... 23

ii.    Defendants' Use of Unpaid Student Labor Displaced Wage-Earning Employees In Both Defendants' Salons and the Marketplace. ........................................................................ 25

iii.    Defendants' Focus on Maximizing Profits Resulted in Little Educational Benefit to Plaintiffs. .......................................... 26

3.    The Ninth Circuit Has Not Adopted the *Glatt* Test, Which Is Inapplicable To This Case. ................................................................ 27

4.    Defendants Rely Upon Non-Binding, Factually Distinguishable Cases Or That Apply Incorrect Legal Standards. ........................... 29

D.    Plaintiffs Are Employees Under California Law. ...................... 32

1.    California's Minimum Wage Laws Protect Plaintiffs, following *Martinez v. Combs*. ........................................................................ 32

ii

2.   Under *Martinez* and Wage Order No. 2, Plaintiffs Are Employees of Paul Mitchell. ................................................................................. 35

i.   Defendants Exercised Control Over Plaintiffs' Work in the Salons ................................................................................. 36

ii.   Defendants Suffered or Permitted Plaintiffs to Work. ......... 37

3.   DLSE Guidance Supports a Finding that Plaintiffs are Employees. 38

E.   Plaintiffs Are Employees Under Nevada Law. .......................................... 39

IV.   CONCLUSION ................................................................................. 40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..................................................................................... 16

*Atkins v. Capri Training Center, Inc.*,
   2014 WL 4930906 (D.N.J. Oct. 1, 2014) ............................................. 31, 32

*Atkins v. General Motors Corp.*,
   701 F.2d 1124 (5th Cir. 1983) ............................................................. 22, 32

*Bailey v. Pilots' Ass'n for Bay and River Delaware*,
   406 F.Supp. 1302 (E.D. Penn. 1976).................................................... 21, 24

*Benjamin v. B&H Education, Inc.*,
   No. 13-4993, 2015 WL 6164891 (N.D. Cal. Oct. 16, 2015)..........................*passim*

*Betancourt v. Advantage Human Resourcing*,
   2014 WL 4365074 (N.D. Cal. Sept. 3, 2014)....................................... 36, 37

*Bonnette v. Cal. Health & Welfare Agency*,
   704 F.2d 1465 (9th Cir. 1983) .................................................................... 18

*Bristol v. Bd. of Cnty. Comm'rs of Cnty. of Clear Creek*,
   312 F.3d 1213 (10th Cir. 2002) .................................................................. 38

*California Pro-Life Council, Inc. v. Getman*,
   328 F.3d 1088 (9th Cir. 2003) .................................................................... 33

*Carrillo v. Schneider Logistics Trans-Loading & Distribution*,
   No. 11-8557, 2014 WL 183956 (C.D. Cal. Jan. 14, 2014) ........................ 36

*Castaneda v. Ensign Group, Inc.*,
   229 Cal.App.4th 1015 (2014) ..................................................................... 36

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).................................................................................... 16

*Cotter v. Lyft, Inc.*,
   60 F.Supp.3d 1067 (N.D. Cal. 2015).......................................................... 32

*Donovan v. New Floridian Hotel, Inc.*,
  676 F.2d 468 (11th Cir. 1982) ..................................................... 21, 23, 29

*EEOC v. Pacific Maritime Association*,
  351 F.3d 1270 (9th Cir. 2003) ................................................................ 38

*Ford v. Yasuda*,
  No. 13-1961, 2014 WL 9887277 (C.D. Cal. July 30, 2014) ............................ *passim*

*Futrell v. Payday California, Inc.*,
  190 Cal.App.4th 1419 (2010) ................................................................ 32

*Glatt v. Fox Searchlight Pictures, Inc.*,
  811 F.3d 528 (2d Cir. 2015) ................................................................ *passim*

*Goldberg v. Whitaker House Cooperative, Inc.*,
  366 U.S. 28 (1961) ................................................................................ 20

*Gonzalez v. Millard Mall Services, Inc.*,
  2012 WL 727867 (S.D. Cal. March 6, 2012) ........................................... 38

*Guerrero v. Superior Court*,
  213 Cal.App.4th at 928-29 ..................................................................... 36

*Guy v. Casal Inst. of Nevada, LLC*,
  No. 13-cv-02263, 2015 WL 56048 (D. Nev. Jan. 5, 2015) .............................. 17, 40

*Harris v. Vector Mktg.*,
  753 F.Supp.2d 996 (N.D. Cal. 2010) ..................................................... 22, 23

*Harris v. Vector Mktg. Corp.*,
  656 F.Supp.2d 1128 (N.D. Cal. 2009) ...................................................... 18

*Hollins v. Regency Corp.*,
  2015 WL 6526964 (N.D. Ill. Oct. 27, 2015) ........................................... 29, 30

*Houle v. Duvall*,
  111 N.H. 333 (1971) ............................................................................. 24

*Huntington Mem'l Hosp. v. Super. Ct.*,
  131 Cal.App.4th 893 (2005) .................................................................. 37

*Hutchison v. Clark*,
  67 Cal.App.2d 155 (1944) ................................................................ 32, 33, 34

v

*Jochim v. Jean Madeline Education Center of Cosmetology, Inc.*,
   2015 WL 1565827 (E.D. Pa. Apr. 8, 2015).......................................................... 31, 32

*Lane v. Carolina Beauty Systems, Inc.*,
   1992 WL 228868 (M.D.N.C. July 2, 1992)................................................................ 24

*Marshall v. Baptist Hospital*,
   473 F.Supp. 465 (D. Tenn. 1979) ........................................................ 21, 22, 25, 27

*Marshall v. Baptist Hospital*,
   668 F.2d 234 (6th Cir. 1981) ............................................................................*passim*

*Martinez v. Combs*,
   49 Cal.4th 35 (2010) ........................................................................................*passim*

*Mayo Foundation for Medical Educ. & Research v. U.S.*,
   562 U.S. 44 (2011)................................................................................................... 2

*McDonald v. Ricardo's on the Beach, Inc.*,
   2013 WL 153860 (C.D. Cal. Jan. 15, 2013)............................................................ 36

*McLaughlin v. Ensley*,
   877 F.2d 1207 (4th Cir. 1989) ................................................................................ 20

*Ortega v. Denver Inst. L.L.C.*,
   No. 14-CV-01351, 2015 WL 4576976 (D. Colo. July 30, 2015)............................ 31

*Randolph v. Budget Rent-A-Car*,
   97 F.3d 319 (9th Cir. 1996) .................................................................................... 18

*Reich v. Shiloh True Light Church of Christ*,
   895 F.Supp. 799 (W.D.N.C. 1995).................................................................... 21, 24

*Rutherford Food v. McComb*,
   331 U.S. 722 (1947)................................................................................................ 19

*Shumann v. Collier Anesthesia*,
   803 F.3d 1199 (11th Cir. 2015) .............................................................................. 27

*Solis v. Laurelbrook Sanitarium & Sch., Inc.*,
   642 F.3d 518 (6th Cir. 2011) ..........................................................................*passim*

*Terry v. Sapphire Gentlemen's Club*,
   336 P.3d 951 (Nev. 2014)....................................................................................... 40

vi

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
   471 U.S. 290 (1985)..................................................................................*passim*

*Torres v. Air to Ground Svcs.*,
   300 F.R.D. 386 (C.D. Cal. 2014)............................................................35, 36

*Twentieth Century Lites v. California Dep't. of Employ.*,
   158 P.2d 600 (Cal. Ct. App. 1945) ...............................................................33

*Twentieth Century Lites v. California Dep't. of Employ.*,
   28 Cal.2d 56 (1946) ......................................................................................33

*U.S. v. City of New York*,
   359 F.3d 83 (2d Cir. 2004) ...........................................................................18

*Walling v. Portland Terminal*,
   330 U.S. 148 (1947)..............................................................................*passim*

*Williams v. Strickland*,
   87 F.3d 1064 (9th Cir. 1996) ........................................................................20

*Winfield v. Babylon Beauty Sch. of Smithtown Inc.*,
   No. 13-6289, 2015 WL 1010431 (E.D.N.Y., Mar. 7, 2015) ........................35

**Statutes, Rules and Regulations**

Federal Rules of Civil Procedure
   Rule 56...........................................................................................................16
   Rule 56(a) .....................................................................................................16

Federal Insurance Contributions Act ...................................................................2

Fair Labor Standards Act of 1938 ..............................................................*passim*

United States Department of Education
   Title IV of the Higher Education Act ...........................................................17

Title 8 California Code of Regulations
   Section 11020 ...............................................................................................35

California Business & Professions Code ........................................................ 33
   Section 7301 ............................................................................................ 33
   Section 7317 ............................................................................................ 35
   Section 7395.1 ......................................................................................... 34
   Section 7395.1(c)(5) ............................................................................... 34

California Labor Code
   Section 1194 ...................................................................................*passim*

California Department of Industrial Relations
   Minimum Wage Laws ............................................................................. 32

California Industrial Welfare Commission
   Wage Order No. 2 .................................................................................... 34
   Wage Order No. 2, §§ 2(D), (F) ............................................................ 35
   Wage Order No. 2, § 2(J) ....................................................................... 35

**Other Authorities**

The California Barbering and Cosmetology Act ......................................... 33, 34, 35, 40

Nevada State Board of Cosmetology
   Nevada Cosmetology Act ..................................................................... 39, 40

The Constitution of the State of Nevada ...................................................... 40

## I.    <u>INTRODUCTION</u>

Defendants employed Plaintiffs and other "students" to provide cosmetology services and sell products to Defendants' paying customers, and to provide menial and clerical labor required to operate Defendants' salons. Defendants required, suffered and permitted Plaintiffs and other students to perform salon work that generated millions in revenue. The substantial revenue Defendants generated through their salons, which represents the bulk of each cosmetology schools' profits during the relevant time period, was not merely indirectly supported by the labor of their students. Rather, this revenue is directly attributable to the sale of services Defendants' cosmetology "students" performed and the products they sold.

The question the Court should answer on summary judgment is whether Paul Mitchell Schools directly and immediately benefitted from the work of their "students." Unquestionably the answer is yes — it was the basis for the schools' entire business model, and additionally served to promote the Paul Mitchell brand. Under the broad coverage of the FLSA, and certainly under the even more expansive definition of employment under California law, Defendants converted their cosmetology students into employees working in Defendants' salons.

Defendants' "educational" system was designed to promote the Paul Mitchell brand and boost profits and sales, to the detriment of students' education. The depiction of the salons set forth in Defendants' motion is not reflective of Defendants' actual policies and practices. "Students" were largely unsupervised and were provided little guidance, essentially performing the same services on paying customers as licensed professionals. Defendants' instructors recorded students as having performed services that students had not in fact had an opportunity to practice because they were busy servicing paying customers – to the detriment of their own educations. Defendants also constantly drove students to sell co-branded Paul Mitchell products to increase revenues and promote the brand, including pet products that were irrelevant to the education for which students had paid so dearly and were working so hard. Defendants alone reaped a substantial,

1  immediate economic benefit from this arrangement that was critical to their for-profit

2  businesses.

3      Moreover, the Court should deny summary judgment on the basis that the work

4  Defendants required students to perform in cleaning, doing laundry, dispensing product,

5  delivering service tickets, fetching coffee, and other "concierge services" were not

6  educational and instead benefitted Defendants and reduced their labor costs. If the Court

7  were to find that such menial labor is "educational" as a matter of law, the minimum

8  wage law would be eviscerated in any workplace that contends it provides an

9  "educational, instructional, or training aspect." *See, e.g., Mayo Foundation for Medical*

10  *Educ. & Research v. U.S.*, 562 U.S. 44, 50 and 58 (2011) (upholding definition of

11  employment under the Federal Insurance Contributions Act as including individuals

12  rendering full-time services, regardless of whether there may be an educational aspect).

13      Under California law, which is even broader and more protective than the FLSA,

14  "employment" is defined by *Martinez v. Combs*, 49 Cal.4th 35, 68 (2010) and the IWC

15  Wage Orders. *Ford v. Yasuda*, No. 13-1961, 2014 WL 9887277, at *5 (C.D. Cal. July

16  30, 2014). Defendants controlled Plaintiffs' wages, hours, and working conditions at

17  their salons, and suffered and permitted Plaintiffs to work there unpaid. Accordingly,

18  Plaintiffs are entitled to protection as employees.

19      Ultimately, the Court should hold that an individual undergoing vocational training is

20  not inherently removed from the minimum wage requirement, or deny summary

21  judgment on the ground that whether Defendants employed Plaintiffs involves disputed

22  issues of material fact. People cannot bargain away their right to the minimum wage

23  because of their desire to get their foot in the door in a new industry. *Tony & Susan*

24  *Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 302 (1985) ("[T]he purposes of the

25  [FLSA] require that it be applied even to those who would decline its protections."). The

26  *Martinez v. Combs* test and the FLSA "economic realities" test (*see, e.g., Solis v.*

27  *Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 524 (6th Cir. 2011)) yield the same

28  outcome: Defendants took an immediate, multi-million dollar benefit from the required

1  labor of their "students," making Defendants liable as employers.

2  **II.     STATEMENT OF RELEVANT FACTS**

3  Defendants' "undisputed facts" are contradicted by the record and gloss over the

4  determinative evidence regarding the realities of the salon businesses in which Plaintiffs

5  were required to work.

6

7  **A.     Defendants' Schools Are Designed to Make a Profit and Support the Paul Mitchell Brand.**

8  Defendants PMNV Las Vegas, LLC, PMCA Bakersfield, LLC, PMHBW LLC, and

9  P2W Learning Systems, LLC (collectively "the Schools") are for-profit businesses that

10  operate individual Paul Mitchell The School cosmetology schools (Statement of

11  Genuine Disputes ("SGD") ¶125).[1] The schools are owned in part by other Paul Mitchell

12  entities, owners and executives, including Defendant Winn Claybaugh and JPMS

13  Holdings, Inc. (SGD ¶126). As for-profit businesses, the stated objective of each school

14  is to make money for the business owners (SGD ¶127).

15  The Schools are required by their franchise agreements with Paul Mitchell Advanced

16  Education, LLC ("PMAE") to implement the proprietary Paul Mitchell curriculum and

17  Paul Mitchell systems, as set forth in various manuals promulgated by franchisor (SGD

18  ¶128). Additionally, the owners and/or directors of the Schools undergo mandatory

19  training and biannual conferences organized by PMAE (SGD ¶129). The Paul Mitchell

20  System implemented at the Schools is designed to promote the Paul Mitchell brand,

21  which includes hair products, salon tools, professional salons, cosmetology schools, and

22  pet care products (SGD ¶130). The Paul Mitchell Schools are "co-branded" with Paul

23  Mitchell products, as "███████████████████████████████████████"

24  (SGD ¶131). Thus, the Schools exist to further the Paul Mitchell brand (SGD ¶132).

25  Among the products and services advertised on Paul Mitchell's website are

26

27  [1]  As stipulated by the parties and pursuant to the Court's order (Dkt. No. 117), Defendants'
motion for summary judgment addresses the threshold legal issue of employee status. The
Court need not address any issues regarding joint employment at this time.

28

"professional services" from "your local salon *or Paul Mitchell School*", directing potential customers to "find a salon *or school* near you" (SGD ¶133). Paul Mitchell Schools offer cosmetology services performed by their student-employees at lower prices than upscale professional salons (SGD ¶134). As described on Paul Mitchell's website, "Paul Mitchell Schools exclusively use and carry Paul Mitchell® products, and they offer an array of guest services including cut, color and style" (SGD ¶¶135-36). Rather than using paid cosmetologists to perform these services and sell Paul Mitchell products, Defendants require students to work in their school salons without pay, under the guise of education.

Paul Mitchell Schools are required to follow detailed manuals that dictate a specific system of operating the schools (SGD ¶137). The mandatory system is tightly controlled and designed to reinforce the Paul Mitchell brand to the public (SGD ¶138). The goal of the Schools is to provide a uniform experience to the members of the public who purchase cosmetology services to ensure they "████████████████████████ ████████████████████████" (SGD ¶139). As set forth in the school manual, the schools support the Paul Mitchell brand for "*every guest, every time.*" (SGD ¶140). As Defendant PMAE admitted, the focus of the schools' salons is on the customer, not the student-employees who perform the services (SGD ¶141). For example, if a student was practicing a service on another student and a paying customer arrived at the salon, the student performing the service on her fellow student had to stop and serve the paying customer instead (SGD ¶142).

**B.    Revenue from Students' Services and Sales Contributed Significantly to Defendants' Profitability and Is a Primary Focus of Defendants' System for Operating the Schools.**

Defendants' detailed system for running the school salons was relentlessly focused on students' sales of services and of Paul Mitchell products (SGD ¶¶143, 11, 56, 82-87). In order to increase revenues and reinforce the brand, Paul Mitchell's policy is for students-employees to try to sell products and services to customers "████████████ ████████," including when greeting customers at the service desk, while performing

4

services, at the end of service (students were required to walk customers to the retail

sales area and place the products used during the service in a basket for the customers),

and by reminding customers throughout the process of various aspects of the products

(SGD ¶¶144, 83). Defendants demanded the students focus on sales goals, "upselling"

additional services, and continually generating business (SGD ¶¶145, 82-83, 86).

The school constantly pressured Plaintiff Gerard to sell products to customers (SGD

¶¶146, 83, 86). For example, instructors interrupted Plaintiff while she was performing a

service on a customer and instructed Plaintiff to discuss the product with the customer,

regardless of whether the product was relevant to the customer's interests or hair type.

(SGD ¶146). Students were required to fill out forms for each guest with Paul Mitchell

product recommendations and to follow specific sales scripts and procedures to

constantly emphasize the products (SGD ¶¶147, 83, 88). The schools kept track of each

student's sales of services and products (SGD, ¶148, 86). Instructors reviewed sales

goals and performance on a daily basis (SGD ¶¶149, 86). The schools held regular

meetings, called "pow wows", with students to review sales performance. The "███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████."

(SGD ¶150). Students were instructed to review their previous day's sales of services

and products and take the necessary steps to increase both (SGD ¶¶151, 86). Sale of

products is not tested on the state cosmetology exam (SGD ¶¶152, 84). Additionally,

students were only instructed on and allowed to sell Paul Mitchell products (SGD ¶¶153,

84).[2] Defendants additionally required that students adhere to their policy of constantly

selling products by enforcing their "2-Minute Plan." The 2-Minute Plan set forth a series

---

[2] Defendants contend students never actually "sold" anything, *i.e.*, did not operate the cash registers, yet the Schools concede that they kept track of student sales of products and services on a daily, weekly, and monthly basis (SGD ¶160). This information was shared with JPMS quarterly (*id.*).

of steps students were required to complete with each customer in order to boost revenue and sales. Specifically, they were required to pull Paul Mitchell products to pitch to the customer, rebook the customer for another appointment at the school, and request that the customer refer others to the school's salon (SGD ¶¶154, 83).

In addition to constantly pressuring students to sell Paul Mitchell products, the schools also conditioned educational experiences and benefits on product sales (SGD ¶¶155, 86). Paul Mitchell hosts a three-day education conference called Caper, where students could attend classes on cosmetology skills and meet other students and professionals (SGD ¶156). According to the Director of the Paul Mitchell School in Las Vegas, students "absolutely" learn a lot by attending Caper (SGD ¶¶156-7). To earn a ticket to attend Caper, students had to "win" a sales contest by selling Paul Mitchell products (SGD ¶¶158, 86). "The Paul Mitchell Schools Caper event is an intense product sales contest held over a three-month period" (SGD ¶156). Plaintiff Northrup testified that, leading up to the Caper event, the school intensely focused on students' product sales and the Caper sales contest (SGD ¶¶158, 86). Defendant JPMS announced that the students attending Caper had "earned their way . . . through selling Paul Mitchell products to the tune of over $2.7 million in retail sales" (SGD ¶158). In fact, the only way students *could* attend Caper was to sell Paul Mitchell products (SGD ¶¶159, 86). In other words, students missed out on an educational opportunity that benefited them if they did not sell Defendants' products.

Despite the schools' purported goal of educating their students, Paul Mitchell Schools have multiple paid employees who are focused primarily on sales, including the Sales Leader, who is a "███████████████" "███████████████████████," and the Service Desk Leader, who directs the service desk team "███████████████ ███████████████████████" (SGD ¶¶161, 86). Indeed, Paul Mitchell's instructors' performance in educating "students" was based on how well the students generated revenues in the salons, including rebooking and sales numbers (SGD ¶162). In addition to these sales-focused jobs, the salons have a Clinic Floor Leader who

6

directs all the service activities performed by the student-employees on the salon floor (SGD ¶163). Tellingly, the job description states that the position is a "sales-focused position" where the primary objective is to meet or exceed the goals for sales of services and Paul Mitchell products (SGD ¶¶164, 86). In addition to training and pushing students to meet the sales goals, the Clinic Floor Leader ensures that the students are led through "pow wows" to discuss sales goals and performance, ensures that students are cleaning and performing their assigned duties such as laundry, washing dishes, and other menial tasks, and enforces Paul Mitchell's policies regarding upselling customers through the 2-Minute Plan (SGD ¶165).

The performance of the schools is benchmarked by revenue from guest services and the sale of products (SGD ¶166). Each school is required to establish an annual sales goal, based on increasing the goal ███ each year (SGD ¶167). Each of the Paul Mitchell Schools generated ████████████ of dollars in income from selling students' salon services to the public and from students' sales of Paul Mitchell products (SGD ¶168). For example, for the Las Vegas location, the school would have operated at a loss in 2014 but for income amounting to ██████ from customers paying for salon services and Paul Mitchell products (SGD ¶169). Due to the revenues generated from students' work in the salon, the school's net income that year was ████ (SGD ¶170). Similarly, in 2013, sales of students' services and retail products accounted for ██ of the school's net income (SGD ¶171). The Las Vegas School's corporate representative admitted that the operating expenses of the school would not change were the school to stop charging customers for services to allow students to practice their cosmetology skills (████). For each of the schools, the financial statements demonstrate that revenues generated from the sale of students' labor in providing services and selling Paul Mitchell products accounted for a significant portion of the school's net income, ranging from █████ (SGD ¶173). Paul Mitchell informed its schools that they could cancel classes "to make up lost service revenue due to cancelling clinic services", underscoring the importance of the income generated by charging for

7

1  students' labor (SGD ¶174).

2  
   ### C.  Paul Mitchell Schools' Sales and Service Systems Are Designed to Generate Money for the Schools, Not Further Plaintiffs' Education.

3  

4  Plaintiffs, and other students, paid $13,900-$18,000 in tuition in the hopes of

5  bettering their future by becoming licensed, employed cosmetologists (SGD ¶175). In

6  order to afford tuition, Plaintiffs took out loans, in an industry where licensed

7  cosmetologists make low wages (SGD ¶176). Defendants also charge students fees if

8  they do not complete their classes within a certain period of time, which Defendants

9  recognized as another revenue stream (SGD ¶177). Students are required to spend

10 thousands more to purchase their student kits and supplies from Defendants (SGD

11 ¶178). After an initial period of training, Plaintiffs began to work shifts in the salons run

12 by the Paul Mitchell Schools (SGD ¶179). However, because Defendants' schools were

13 focused on maximizing revenues, Plaintiffs' educational goals were subverted in order

14 to generate sales of services and products and to ensure a steady supply of customers.

15 
   #### 1.  <u>Student-Employees Are Required to Serve Paying Customers, Rather than Practice the Variety of Procedures Required for the Exam and Future Success as a Professional.</u>

16 

17 Paul Mitchell Schools' customer service policies require that students provide

18 whatever services a customer requests, regardless of whether performing the service is

19 educationally beneficial to the student, *e.g.*, whether or not the student is already fully

20 trained and proficient in performing a particular service (SGD ¶¶180, 71). For example,

21 Plaintiff Thomas was assigned customers who wanted certain color services because the

22 front desk knew he was good at those services (SGD ¶¶181, 71). In order to service

23 those customers, he was pulled away from practicing other required skills on

24 mannequins (SGD ¶182). The schools enforce this policy by disciplining students for

25 declining to perform a service on a customer, including through suspensions and/or

26 terminations (SGD ¶¶183, 71).

27 Students had "tally sheets" that were meant to track the number and type of the

28 different services they had practiced in the salon (SGD ¶184). When student-employees

1    were busy doing repeat services for customers all day, their instructors would check off

2    services they had not actually had an opportunity to practice (SGD ¶¶185). For example,

3    Plaintiff Palominos' instructors checked off her tally sheet indicating that she had

4    performed services like facials, perms, and manicures, which she had not actually done

5    because she had been busy doing cuts and colors for paying customers (SGD ¶186).

6    Rather than allowing students to practice varied techniques and skills, as required to pass

7    the cosmetology exam and obtain a license, Paul Mitchell Schools prioritized the needs

8    of paying customers, pushing students through the schools without actually ensuring

9    they received the training for which they had paid (SGD ¶¶187, 11, 71).

## 2. Paul Mitchell Schools, Not Student-Employees, Benefit From the Sale of Cosmetology Services.

12       Paul Mitchell Schools pushed students to solicit their friends and family to purchase

13   services and products at their salons, suggesting to students that they contact people they

14   knew weekly via telephone calls, text messages, or social media (SGD ¶¶188, 93).

15   However, if students did have their friends or family come in, they could not practice

16   services on them for free or at a discount (SGD ¶189). Students were prohibited from

17   soliciting customers for any other salon or providing personal contact information to

18   customers for future business after they left Paul Mitchell Schools (SGD ¶¶190, 92). Nor

19   did the schools refer customers to their former students who had moved on to other

20   salons (*id.*).

21       Plaintiff Thomas was unable to get his friends to come in for services because the

22   salon prices were too high (SGD ¶192). The prices, and Defendants' decision to charge

23   customers for students' services, created an environment where there was often not

24   enough variation of service requests and customers for students to practice (SGD ¶193).

25   While Defendants maintain that having live customers is important to train students,

26   they admit that students who perform services for free at Paul Mitchell-sponsored

27   charity events or fashion shows received the same educational benefit as students who

28   worked on paying customers (SGD ¶194). That is, students learned as much in providing

free cosmetology services to seniors or members of the armed forces as they did in providing paid services to the general public (*id.*). Defendants admit that, had they not charged for students' services, they would have a virtually limitless supply of potential customers for students to practice their cosmetology skills (SGD ¶195).

### 3. Student-Employees Are Required to Perform Many Hours of Manual Labor With No Educational Benefit.

"Student"-salon workers are required to perform many menial tasks for which they do not need to enroll in cosmetology school or obtain a cosmetology license, and which they do not need to practice to succeed in their chosen field (SGD ¶¶197, 11, 30, 36, 52, 70, 94, 96-102, 105,108). Student-employees were regularly rotated through different "concierge" stations in the salon to perform non-cosmetologist chores, during which time they were not able to practice their cosmetology skills (SGD ¶¶198, 96-102). Students were assigned to a station for an entire four or five hour shift (SGD ¶¶199, 200). The positions that students were regularly assigned included:

- Service Host – greets customers, directs customers to the service desk, gives customers magazines and coffee, keeps key areas clean including bathrooms and seating area, sweeps, and provides facility tours (SGD ¶¶201, 52, 96-97);

- Ticket Leader – picks up a customer service ticket generated by the service desk, makes sure the ticket is folded, and walks the ticket to the student who is to perform the service; cleans service desk, area surrounding service desk, and key areas including restrooms (SGD ¶202, 52, 70, 96-97, 101);

- Towel Leader – takes dirty towels to the laundry room, provides clean rolled towels, picks up trash and empties trash bins, wipes down chairs, wipes shampoo bowls, cleans and straightens shampoo bottles, mops, and keeps key areas clean including bathrooms and student lunchroom (SGD ¶¶203, 36, 98-99);

- Dispense Leader – puts products in portion cups for other students, picks up dirty towels, does laundry, folds towels, cleans floors, keeps key areas clean including bathrooms, and ensures inventory is sufficient (SGD

10

¶¶204, 70, 98-99);

- Take Home Monitor – stands near the products that are for sale and assists other students in making sales of Paul Mitchell products, monitors and records that students are following the 2-Minute Plan, and cleans and organizes the product shelves (SGD ¶¶205, 52);

- Wash House Leader – puts shampoo and conditioner in portion cups, keeps the wash house area clean, empties trash, wipes out shampoo bowls for residual products and hair left in the drain, wipes stains from the floor and counters, refills bottles, does laundry, and keeps key areas clean including bathrooms (SGD ¶¶206, 70, 100); and

- Color Bar Leader – maintains organization and cleanliness of the Color Bar area, including cleaning and organizing the counters and chairs, washing bowls and brushes, and cleaning floors and spills; collects service tickets, reports product theft, and keeps key areas clean including bathrooms (SGD ¶¶207, 36, 101).

The responsibilities and job expectations were communicated to students on "worksheets" that described the duties and "additional concierge assignments" of each position (SGD ¶¶208, 99-100, 102). The worksheets all stated: "Your performance is important to everyone on the clinic floor and reflects your commitment as a Future Professional. You will receive a performance rating and feedback on your contributions" (SGD ¶209). When students were not assigned to a station, they were still required to clean the salon (SGD ¶¶210, 108). For example, Plaintiff Handcock was assigned a daily task to clean at the end of every day as part of the school-wide "sweep team", whereby each student was responsible for cleaning a certain area of the salon (SGD ¶¶211, 108).

This repetitive menial labor had no educational value to students, as they are basic tasks that did not require practice to understand (SGD ¶¶212, 11, 30, 36, 52, 70, 94, 96-102, 105,108). Plaintiffs did not need to "learn" how to fold towels and they certainly did not need to "practice" doing and folding laundry (SGD ¶¶213, 36, 94, 98). Nor did the jobs require discretion or learning (SGD ¶¶212, 213, 11, 30, 52, 96-102). For example, working in the dispensary includes stocking and dispensing products for other students (SGD ¶¶214, 204, 70, 98-99). In practice, this meant that students filled cups

11

from bottles and stacked them on trays for other students to retrieve; they did not make decisions such as how much of a specific product to use on a customer (*id.*).

The work that student-employees were required to perform was also done by paid employees of the schools (SGD ¶¶215, 36, 94). The Las Vegas School had two paid employees who cleaned, did laundry, and restocked towels alongside the students assigned to laundry duties (SGD ¶216). Like the student-employees, the paid instructors also restocked products (SGD ¶217). If students were not available to stock products, wipe out sinks, or do laundry, paid employees would have to do the work (SGD ¶¶218, 100). At the Sherman Oaks School, student rotations did not include shifts as a "service ticket leader" – instead, a paid employee performed this task (SGD ¶219). Doing repetitive manual labor such as laundry, mopping spills, and cleaning dishes is not a component of the state-mandated curriculum (SGD ¶¶220, 96). Students were required to be clocked in while working in the salons and received "clock hours" for time spent performing manual tasks instead of practicing their cosmetology skills (SGD ¶¶221, 30, 102).

### 4. The "Students" Receive Minimal Educational Supervision in Defendant's Salons.

Students are often unsupervised while in the salon and often lack direct, hands-on supervision and instruction (SGD ¶¶222, 12, 38, 74-75, 78, 80-81). As set forth above, instructors signed off on services that student-employees had not performed; they also signed off on services without looking at the customer or reviewing the student's work (SGD ¶¶223, 38, 75, 80). At times, there were no instructors on the clinic floor, so Plaintiffs would have to go search for the instructor or find an instructor from another section to get help (SGD ¶¶224, 38, 78, 81). Plaintiff Handcock often experienced times when her instructor was not present and had seemed to disappear (SGD ¶¶225, 78). Additionally, at times, there were insufficient instructors available, so students were required to wait 15-20 minutes for an instructor's assistance (SGD ¶¶226, 81). While Defendants may claim they kept low student to teacher ratios, in fact, on Saturdays (one

12

1    of the busier days), there were up to 100 students working on the salon floor with only 4

2    or 5 instructors available (SGD ¶¶227, 12).

3                    **5.   Defendants Require "Students" to Sell Paul Mitchell Products,**
                          **Including Pet Products Unrelated to Their Education.**
4

5        As discussed above, Defendants constantly exhorted student-employees to sell Paul

6    Mitchell products at every opportunity (SGD ¶¶228, 11, 56, 82-87). Students were only

7    trained on Paul Mitchell products, not the wide variety of other beauty products that

8    might be relevant to their professional practice (SGD ¶¶229, 56, 84). Paul Mitchell

9    Schools had extensive lesson plans on training students on their products, including

10   training on counterfeit Paul Mitchell products and how students could "join the fight"

11   against the erosion of the Paul Mitchell brand (SGD ¶230).[3]

12       Additionally, the schools held classes to train students on selling pet products, co-

13   branded with Paul Mitchell products as "John Paul Pet" (SGD ¶¶231, 11, 84), and

14   coaxed their students into spending the education hours they paid for in peddling John

15   Paul's pet line. As long as students were clocked in, they received "clock hours" as part

16   of their state-required 1600 hours of training for learning about and selling John Paul Pet

17   products (SGD ¶232). Students were incentivized to sell the pet products through

18   trainings and contests put on by the schools where students could win prizes, such as an

19   all-expense paid trip (SGD ¶¶233, 25, 86). Defendants justified this waste of educational

20   ///

21

22        [3]  Defendants' claim that their schools have "advisory boards" made up of unnamed
     individuals in the industry.  Defendants' contend that the advisory boards opine that it is
23   important for entry-level cosmetologists to have knowledge of and the ability to sell
     cosmetology products (Safadi Dec. ¶72, Pederson Dec. ¶40, Mantea Dec. ¶75, Eidle Dec. ¶47).
24   However, the evidence submitted in support of these statements does not support these claims.
     The advisory board forms do not mention product knowledge or sales skills as one of the
25   "Curriculum and Educational Objectives" approved by the evaluators (*see* Safadi Dec. Ex. J;
     Eidle Dec. Ex. P). Moreover, no evaluator lists product knowledge and sales skills as additional
26   abilities that students should be developing. In fact, neither the evaluation forms nor the
     meeting summaries support the assertion that salon owners and representatives believe sales
27   and product knowledge are particularly important for entry-level cosmetologists (Eidle Dec.
     Ex. P).
28

1  time as "a learning experience for [students] as part of what's out there for products that

2  are available for humans or pets" (SGD ¶234).

### D. Defendants Control the Wages, Hours, and Working Conditions of the "Student"-Salon Workers, Suffering and Permitting Unpaid Work.

5  Defendants exert complete control of the "students" while they work in the salons

6  (SGD ¶235, 11). The Paul Mitchell manuals set forth in great detail the company's

7  policies for how students are required to interact with customers, including detailed

8  scripts and procedures such as the "2-Minute Method" for selling products and

9  rebooking customers (SGD ¶236). Student-employees are also required to conform to

10  the Paul Mitchell dress code (SGD ¶237). Students are trained extensively on the Paul

11  Mitchell culture and must follow Paul Mitchell's service procedures, using Paul Mitchell

12  forms, techniques, and dialogue (SGD ¶238). Students are required to purchase a

13  standard kit of cosmetology supplies for use while serving Defendants' customers (SGD

14  ¶¶243). Those kits, which cost several thousand dollars, include specific tools and

15  equipment such as scissors, hot irons, blow dryers, cosmetics, and combs (SGD ¶244).

16  While serving customers, students were only allowed to use Paul Mitchell products,

17  even if another company's product might have been preferable (SGD ¶¶135-136, 245).

18  Defendants set schedules of work and require students to clock in and out (SGD

19  ¶239). Defendants enforce these schedules by charging students fees for missed classes

20  (SGD ¶240). Defendants penalized students for failing to follow their policies, including

21  those regarding customer service, through write-ups and suspensions (SGD ¶241).

22  Students understand that they can be expelled from programs for failing to sell products

23  (SGD ¶242, 82).

### E. Plaintiffs Were Unprepared to Take the Licensing Exam and for Work in Professional Salons.

26  Because of the lack of instruction and practical training, Plaintiff Gerard did not feel

27  prepared to take the test after the completion of her schooling (SGD ¶¶246, 55, 91, 116).

28  Accordingly, she studied the state-provided materials on her own and took a private

tutoring class to prepare for the state licensing exam (SGD ¶¶247, 55, 91, 116). The methods for performing specific core tasks that were prescribed by the state were different than what she had been taught at Paul Mitchell (SGD ¶248, 116). She complained to her school about the lack of attention to students and being unprepared for the state board several months before she graduated (SGD ¶¶249, 116).

The majority of Plaintiffs were unable to secure employment as cosmetologists following their graduation from Paul Mitchell Schools (SGD ¶250). Plaintiff Palominos applied to numerous places and had four short-term stints at professional salons, of which only one job paid her (SGD ¶251). She worked briefly at a spa that her school helped her secure, but the job was unpaid (SGD ¶252, 123). She is not currently working as a cosmetologist (SGD ¶253). Plaintiff Thomas attempted to enhance his future opportunities by joining Phase II, which was an "accelerated learning" program that promised a lower ratio of instructors in a more premium salon setting. Phase II services were charged at higher prices to customers, yet the students did not receive any additional bonuses, incentives, or compensation (SGD ¶¶254, 59-60). Plaintiff Thomas was told that the school would help him secure a job at a Paul Mitchell professional salon and that, if he joined Phase II, he would be more likely to get a job at a Paul Mitchell salon (SGD ¶255). However, Plaintiff Thomas did not become a licensed cosmetologist and is not now employed as a cosmetologist (SGD ¶256). Even the two Plaintiffs who were able to secure employment as cosmetologists felt unprepared for their professional jobs and were required to relearn techniques such as coloring (SGD ¶¶257, 55, 91, 116).

## F.   Defendants' Use of Plaintiffs' Unpaid Labor Allows Defendants to Compete Unfairly.

The prices Defendants charge the public are lower than what licensed cosmetologists at upscale professional salons charge (SGD ¶258). The fees for services are cheaper than other salons because they are performed by the unpaid labor force –*i.e.,* the "students" (SGD ¶259). Defendants baldly admit that their salons compete in the marketplace with

professional salons and exhort their schools to take care of their customers, reminding them that "███████████████████████████████████████████████ ████████████████████████████████████" (SGD ¶260). Indeed, the prices at Supercuts, a well-known "discount salon" are comparable to those of Paul Mitchell Schools (SGD ¶261). As set forth in the Service Desk and Clinic Floor Systems manual that all schools must follow, Paul Mitchell pushes its schools to maintain the brand's status of "████████ ██████████████████████████████████████" (SGD ¶262). Accordingly, student-employees are required to clean, stock products, do laundry, and otherwise maintain the appearance of the salon – at the cost of their own educations (SGD ¶¶263, 11, 30, 36, 52, 70, 94, 96-102, 105,108).

Defendants PMAE and JPMS admit that it would not object to paying students for their services while on the salon floor (SGD ¶264). Students did receive tips from customers (SGD ¶¶265, 25). They also received prizes and other rewards from the schools for selling Paul Mitchell products (SGD ¶¶266, 25, 86).

## III. LEGAL ANALYSIS AND ARGUMENT

### A. Standard of Review

Summary judgment should only be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FRCP 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where there is a failure of proof or "[w]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied[.]" FRCP 56 (Advisory Committee Notes, subdivision (c)). In determining whether there is a genuine issue of material fact, the court must accept as true all evidence favorable to the non-moving party and accord the non-moving party all favorable inferences that may be drawn from such evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

///

///

**B.    Plaintiffs Are Entitled to The Full Employment Status Inquiries Under State and Federal Law As There Is No Categorical Exclusion of Cosmetology Students.**

Defendants' reliance on the fact that their operations are subject to regulation by various statutes and regulatory agencies does not address the issue of employment under the FLSA, California Labor Code, or Nevada's wage laws, as numerous courts have found. *Guy v. Casal Inst. of Nevada, LLC*, No. 13-cv-02263, 2015 WL 56048, *2–3 (D. Nev. Jan. 5, 2015) (Nevada Cosmetology Act does not prohibit compensation of cosmetology students); *Ford*, 2014 WL 9887277 at *5 (accord, applying California law). Defendants readily admit that cosmetology students were not required to perform menial cleaning and stocking tasks, sell products (much less solely Paul Mitchell-branded products), or perform services on paying customers in order to fulfill their "clock hour" requirements for the state cosmetology licensing exams (SGD ¶¶152, 11). Rather, Defendants converted students seeking an education into free labor in their for-profit businesses for the monetary benefit of Defendants.

Indeed, Defendants' counsel made the exact same arguments on behalf of their cosmetology school client, B&H Education d/b/a Marinello Schools of Beauty, in a similar case regarding the employment of cosmetology students in *Benjamin v. B&H Education, Inc.*, No. 13-4993, 2015 WL 6164891, *1 (N.D. Cal. Oct. 16, 2015), *appeal docketed*, No. 15-17147 (9th Cir. Oct. 28, 2015). Mere months after the *Benjamin* court granted summary judgment in favor of the defendant, the Department of Education denied the school's application for recertification to continue to participate in federal Title IV student financial assistance programs, finding, *inter alia*, that the school misrepresented to students their educational programs and charged excessive fees for tardiness and absence. Students were promised in-depth training taught by quality staff, but instead were pulled "out of theory instruction in order to work on the clinic floor" and "did not receive the training in all functional areas needed to obtain jobs in the field" (Mandelbaum Declaration ISO Plaintiffs' Opposition to Motion for Summary Judgment, Exs. TT-XX, p.8). The same is true here. Defendants' reliance on a "state-mandated

1   curriculum"[4] and lax oversight by cosmetology boards has no bearing on the issue of

2   employment under state and federal law.

3   ## C.   Plaintiffs Are Employees Under the FLSA

4        While the ultimate determination of a defendant's status as an employer under the

5   FLSA is a question of law, the legal determination rests of "subsidiary factual

6   [findings]." *See Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1469 (9th

7   Cir. 1983), *abrogated on other grounds by Garcia v. San Antonio Metro. Transit Auth.*,

8   469 U.S. 528, 539 (1985); *see also Harris v. Vector Mktg. Corp.*, 656 F.Supp.2d 1128,

9   1136, 1138 (N.D. Cal. 2009); *Benjamin*, 2015 WL 6164891, at *1 (finding that whether

10  cosmetology students are employees is a question for the jury where evidence suggests

11  reasonable factfinders could disagree). Under the FLSA, ·the definition of the term

12  'employee' in the FLSA is extremely broad." *Randolph v. Budget Rent-A-Car*, 97 F.3d

13  319, 326 n.1 (9th Cir. 1996) (Under the FLSA, "the term 'employee' is used in the

14  broadest sense 'ever . . . included in any one act.'"). On the other hand, the *Portland*

15  *Terminal* trainee exception *is* necessarily narrow given the FLSA's expansive coverage.

16       Plaintiffs are entitled to compensation, at a minimum, for the time they spent

17  servicing Defendants' paying customers and performing other tasks for Defendants'

18  pecuniary gain and that are necessary to Defendants' operation of their salons, such as

19  cleaning, washing and folding laundry, supplying customers with coffee, dispensing

20  products into portion cups, securing Defendants' supplies, and selling Defendants'

21  products. *See U.S. v. City of New York*, 359 F.3d 83, 94-95 (2d Cir. 2004) (rejecting

22  argument that the FLSA imposes an "artificial dichotomy" with respect to employment

23  status, as "a person may be an employee with respect to certain of his duties and not be

24  an employee with respect to others.")

25

26       [4]  Plaintiffs dispute Defendants' characterization of the basic state requirements of technical
     and practical instruction as mandating or sanctioning Defendants' cosmetology program,

27   wherein students received clock hours for learning about and selling pet products or performing
     menial tasks such as laundry (SGD ¶¶96, 220).

28

### 1. Under *Portland Terminal* and the Economic Realities Test, Plaintiffs are Employees Under the FLSA.

There is no rigid, categorical exclusion of vocational students, trainees, interns, and volunteers from the FLSA. *See generally Rutherford Food v. McComb*, 331 U.S. 722, 726-27 and 729 (1947) (noting that the FLSA applies "to many persons and working relationships, which prior to this Act, were not deemed to fall within an employer-employee category."). In *Portland Terminal*, the Supreme Court considered whether prospective railroad brakemen undergoing a training course were employees for purposes of the FLSA. *Walling v. Portland Terminal*, 330 U.S. 148, 149 (1947). The trainees were only "permitted to do actual work under close scrutiny." *Id*. Moreover, the training did not "displace any of the regular employees, who do most of the work themselves, and must stand immediately by to supervise whatever the trainees do." *Id*., at 149-150. Key to the decision was the Court's finding that "the railroads receive no 'immediate advantage' from any work done by the trainees." *Id*., at 153. In declining to extend the FLSA to the trainees, *Portland Terminal* relied upon the absence of any economic value in the work performed by the trainees, as such work did "not expedite the company business, but may, and sometimes does, actually impede and retard it." *Id*., at 150. While *Portland Terminal* involved a seven- or eight-day training program, it expressly reserved for future cases situations where an employer "accepted the services of beginners at pay less than the legal minimum" and received an "immediate advantage" from such labor. *Id.*, at 152-53.

Building on *Portland Terminal*, in *Tony and Susan Alamo Foundation v. Secretary of Labor*, the Supreme Court held that "volunteers" for a religious foundation who labored, sometimes for several years, without any agreement or expectation of cash compensation were employees under the FLSA. 471 U.S. 290, 301-02 (1985). There, all of the individuals discussed by the enforcing agency considered their labor to be voluntary. *Id*., at 300. Nonetheless, the Court stated that this did not end the inquiry, as "the test of employment under the Act is one of 'economic reality.'" *Id*., at 301 (quoting *Goldberg v. Whitaker House Cooperative, Inc*., 366 U.S. 28, 33 (1961)). The Court

1   distinguished this case from *Portland Terminal* based on the longer duration of the

2   unpaid work. *Id*. Moreover, the Foundation's commercial businesses, including service

3   stations, retail clothing, grocery outlets, and other enterprises were largely staffed by its

4   "volunteers." *Id*., at 292 and 302. Even though there was no agreement for or

5   expectation of compensation, the Court stated that the rights under the FLSA are

6   unwaivable and apply "even to those who would decline its protections," reasoning that

7   "exceptions to coverage would affect many more people than those workers directly at

8   issue in this case and would be likely to exert a general downward pressure on wages in

9   competing businesses." *Id*., at 302.

10       The Ninth Circuit has not yet addressed the issue of whether vocational students

11   providing services to the public for a fee are "employees" under the FLSA.[5] Here, unlike

12   the short-term program in *Portland Terminal,* and applying the economic realities test as

13   in *Alamo,* the Court should find the Paul Mitchell Schools' "student"-salon workers

14   were employees when they were generating a direct and immediate benefit for

15   Defendants. *See Alamo*, 471 U.S. at 293-94; *Goldberg*, 366 U.S. at 31-33 (applying

16   economic realities test and holding members of cooperative with ownership interest

17   were also FLSA employees); *Marshall v. Baptist Hospital*, 668 F.2d 234, 236 (6th Cir.

18   1981) (vocational school radiology students properly found to be FLSA employees for

19   hours spent working in hospital, as their labor conferred a "substantial economic

20   benefit" upon the hospital); *Laurelbrook*, 642 F.3d at 524 (no *per se* exclusion of

21   vocational school students from FLSA; rather, economic realities test determines if

22   FLSA coverage exists and no employment relationship created when the students' labor

23   does not provide any substantial economic value to the alleged employer); *McLaughlin*

24   *v. Ensley*, 877 F.2d 1207, 1209-10 (4th Cir. 1989) (holding that the proper legal inquiry

25   _____

26       [5]  The Ninth Circuit recognized in *Williams v. Strickland*, 87 F.3d 1064 (9th Cir. 1996), that
the analysis of whether a volunteer is an employee under the FLSA is grounded in the *Portland
Terminal* factors and the principles set forth in *Alamo Foundation*. However, the Ninth Circuit

27   has yet to address an issue of FLSA employment in the context of trainees or vocational school

28   "students".

1   was whether the alleged employer benefitted from the relationship, including factors

2   such as the nature of the training and the advantage to the employer in obtaining better

3   workers and aid to his regular employees).[6]

4       In evaluating the economic realities to determine whether a vocational training

5   program creates an employment relationship, the Court does not rely on the labels the

6   parties previously ascribed to themselves – *i.e.*, school and student. *See Laurelbrook*,

7   642 F.3d at 524; *Reich*, 895 F.Supp. at 815. Whether the parties, or Defendant, had the

8   intention to create an employment relationship "is irrelevant; it is sufficient that one

9   person 'suffer or permit (another) to work.'" *Donovan v. New Floridian Hotel, Inc*., 676

10  F.2d 468, 470-71 (11th Cir. 1982) (internal citation and quotation omitted).

11      In *Marshall v. Baptist Hospital*, 473 F.Supp. 465, 468 (D. Tenn. 1979), *rev'd on*

12  *other grounds*, 668 F.2d 234 (6th Cir. 1981), the court examined the "economic

13  realities" of the relationship between trainees engaged in clinical training in radiologic

14  technology at a hospital as part of a two-year vocational program. As in the case at bar,

15  in *Marshall,* "trainees simply continued to be assigned to work wherever they were

16  needed without regard to their becoming proficient in all areas of the various X-ray

17  procedures." *Id.,* at 476. The students' clinical work consisted of working at a hospital,

18  where the students performed X-ray procedures and a variety of other menial tasks,

19  including stocking rooms, cleaning up after patients, relieving the receptionist, and

20  performing clerical work. *Id*., at 472-73. As in this case, the *Marshall* plaintiffs testified

21  they received minimal supervision from instructors, did not rotate to different skill areas,

22  performed menial tasks that otherwise would be done by paid employees, and that their

23  work was billed to the public. Despite the fact that the students understood they would

24        [6] *See also Reich v. Shiloh True Light Church of Christ*, 895 F.Supp. 799, 818 (W.D.N.C.

25  1995) (finding that the defendant church was employer under the FLSA, as the church was the
    beneficiary of work done by minors on construction sites through church vocational program);

26  *Bailey v. Pilots' Ass'n for Bay and River Delaware*, 406 F.Supp. 1302, 1307 (E.D. Penn. 1976)
    (holding that apprentice trainee was an employee under the FLSA where his labor was of

27  immediate benefit to the defendant, despite the fact that the training had some educational
    value).

28

not be paid wages, the Court found the students' work inured to the defendant's benefit, such that an employment relationship attached. *Id.*, at 476-77. The defendant received direct and substantial benefit from their work, while the educational value of the program was reduced because the hospital provided little supervision. *Id.*, at 476-77. This case is like *Marshall*, because Defendants "exploited the training program, turning it to [their] own advantage." *Id.,* at 477. As in *Marshall,* Paul Mitchell Schools benefited from Plaintiffs' repetitive work, and sacrificed education for revenues in an environment where "student"-salon workers were provided minimal supervision.

## 2. **The Court Should Apply the DOL's Six-Factor Test, Derived from *Portland Terminal*, Which Supports a Finding that Plaintiffs Are Employees.**

A six-factor test derived from *Portland Terminal* by the Department of Labor's Wage and Hour Division ("DOL") has been analyzed by courts under similar circumstances. *Harris v. Vector Mktg.*, 753 F.Supp.2d 996, 1005-06 (N.D. Cal. 2010). The DOL factors are entitled to deference. *See, e.g., Atkins v. General Motors Corp.,* 701 F.2d 1124, 1127-28 (5th Cir. 1983) (giving substantial deference to DOL's approach); *cf. Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528 (2d Cir. 2015) (declining to adopt DOL test). The six factors include (Mandelbaum Dec., Ex. AAA):

- The training, even though it includes actual operation of the facilities of the employer, is similar to training which would be given in an educational environment;

- The training is for the benefit of the trainee;

- The trainee does not displace regular employees, but works under close supervision of existing staff;

- The employer that provides the training derives no immediate advantage from the activities of the trainee and on occasion its operations may actually be impeded;

- The trainee is not necessarily entitled to a job at the conclusion of the training; and

- The employer and the trainee understand that the trainee is not entitled to wages for the time spent in the training.[7]

The DOL's Field Operations Handbook emphasizes that *each* factor of the test must be met to exclude a trainee or student from coverage under the FLSA. *Id.*; *see also Harris*, 753 F.Supp.2d at 1006. Under the DOL's six-factor *Portland Terminal* test, Plaintiffs are employees under the FLSA, because their work immediately and substantially benefitted Defendants by generating revenues, competed with and displaced paid employees, and because Plaintiffs received minimal supervision or educational benefit.

### i. Plaintiffs' Unpaid Labor in Defendants' Salons Confers an Immediate Economic Benefit on Defendants.

The revenues that Paul Mitchell Schools receive from the students' labor in their salons, including the sale of services and products, constitute a significant portion of Defendants' business, ranging from ████% of Defendants' annual net income (SGD ¶173). The "student" work in Defendants' salon for the four schools Plaintiffs attended generated ████████ in 2013– ███% of the company's revenues (Mandelbaum Dec., Exs. T-W).[8] Without the revenues from the "students'" salon work, Defendants' businesses would have been far less profitable, earning only a fraction of its net income in 2013 (just $████████ instead of the actual reported net income of $████████) (*id.*).

Additionally, Paul Mitchell Schools' objective is to promote the Paul Mitchell brand, from extensive indoctrination of students on Paul Mitchell products and "culture" to enforcing Paul Mitchell's customer service requirements and methods in all aspects of students' work (SGD ¶¶235, 238, 11). Rather than allowing students to learn and practice the skills and training required by the state licensing board, Defendants waste

---

[7] The last factor is not relevant here and should be considered the least dispositive – recall *Alamo*, 471 U.S. at 301-02: "the purposes of the [FLSA] require it be applied even to those who would decline its protections." *See also Donovan*, 676 F.2d at 470-71 (the parties' intention to create an employment relationship "is irrelevant").

[8] Defendants only produced financial data for the Sherman Oaks School for 2012 and 2013. For the three remaining schools, the data for 2014 is consistent – revenues from students' work selling salon services and products was $████████, accounting for ████% of the schools' total revenue and ██% of net income (Mandelbaum Dec., Exs. U-W).

PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT RE: EMPLOYMENT
CASE NO. 2:14-CV-04999-DSF (JC)

students' valuable "clock hours" on peddling Paul Mitchell pet products and on cleaning and maintaining the salon so that customers have a favorable view of the Paul Mitchell Schools and brand (SGD ¶232). Paul Mitchell recognizes the substantial benefit that the students provide through their forced promotion of the brand, emphasizing it in every aspect of Defendants' mandatory system for running the schools (SGD ¶130).

*Portland Terminal* establishes that "a learner who contributes some measurable gain to the person or company for whom he works" is properly treated as an employee for minimum wage purposes. *Houle v. Duvall*, 111 N.H. 333, 334-35 (1971). The New Hampshire Supreme Court in *Houle* found that students of a cosmetology school working on paying customers are engaged in the dual pursuits of education and "pecuniary gain" and must be compensated with the minimum wage "because the services which hairdressing students render to paying customers result in direct and immediate pecuniary gain to hairdressing schools." *Id.*, at 334.

The Court should find *Houle* persuasive, and determine as a matter of law that Defendant fails the "immediate advantage" prong of the six-prong DOL test for exemption from the ordinary requirement to pay wages. Defendants are double-dipping – the four schools already receive over $▮▮▮▮▮ a year in tuition and fees to provide education services, but elect to convert the hands-on, practical training component of the program into a second profit generator, to the tune of over $▮▮▮▮▮ annually.

Where the defendant "convert[s] what may, at one time, have been a vocational program, into a commercial enterprise involving hundreds of thousands of dollars," an employment relationship exists under the FLSA. *Reich*, 895 F.Supp. at 818. This is so even where the "student" received "some educational benefit," including eligibility for licensing. *Bailey*, 406 F.Supp. at 1305, 1307; *Marshall*, 668 F.2d at 236.[9]

///

---

[9]  *Cf. Lane v. Carolina Beauty Systems, Inc.*, 1992 WL 228868, at *2 (M.D.N.C. July 2, 1992) (cosmetology teacher trainee not an employee, where defendant "did not derive any immediate financial benefit from plaintiff's presence in the school").

## ii. **Defendants' Use of Unpaid Student Labor Displaced Wage-Earning Employees In Both Defendants' Salons and the Marketplace.**

Among its primary objectives, the FLSA seeks to block the negative effect on workers' wages of other workers' sub-minimum wage labor. The FLSA aims to prevent the use of free labor that would cause "the displacement of regular employees or applicants and the exploitation of unorganized laborers." *Marshall*, 473 F.Supp. at 468. Contrary to Defendants' assertion that only paid janitorial staff were utilized to clean the salons, Defendants' use of student labor displaces hourly employees who would otherwise be required to perform janitorial and maintenance duties that "students" are coopted into performing (and upon which the students' grades depend) (SGD ¶¶215-18). In some cases, Defendants hire supplemental labor to do the *exact same work* that students also perform, to augment the students' work (SGD ¶216-18). In other cases, Defendants admit that, but for students' work doing laundry, cleaning hair out of sinks, and other menial tasks, paid employees would have to step in to perform the work (Eidle Dec., ¶60; Safadi Dec., ¶75; Mantea Dec., ¶51). Students are working alongside paid employees, doing the same tasks – none of which is required to pass the state licensing exam (SGD ¶¶216-19). Students do not need to "practice" folding towels or cleaning sinks; nor is such work necessary to their future success as professionals (SGD ¶¶213-14). Defendants' characterization of such menial tasks as learning is beyond the pale.

Defendants' non-payment of wages for such tasks also enables unfair competition with salons operating with paid staff. *See Alamo*, 471 U.S. at 299 (observing that the defendant's "businesses serve the general public in competition with ordinary commercial enterprises" and its use of unpaid "volunteer" labor would give them and "similar organizations an advantage over their competitors"). It is undisputed that Defendants compete with "value or discount salon[s]", whose prices are comparable (SGD ¶¶260, 261).[10]

---

[10] Defendants' assertion that the existence of the schools' advisory boards refutes

### iii. Defendants' Focus on Maximizing Profits Resulted in Little Educational Benefit to Plaintiffs.

Paul Mitchell Schools choose to maximize salon revenues at the expense of the value of the education their "students" receive. The schools enforce a strict policy of never refusing service to a customer – regardless of what skills the "student" needs to practice (SGD ¶180). Students are required to service customers in the salon even if this means they will not be able to practice certain required techniques or study (SGD ¶¶11, 71).

Defendants' instructors regularly recorded students as having completed certain services, knowing that in fact students had not done those services (SGD ¶223). Instructors did so because the paying customers needed to be served, regardless of the skills students should have been practicing instead. Moreover, instructors were often not available for students who were performing services on the salon floor; when students were actually able to find an instructor, they were provided little feedback or guidance (SGD ¶¶222-25). Defendants' claim that students were "supervised and guided by licensed instructors" (SGD ¶38) is contradicted by the evidence.

Defendants admit that the experience of working on a live model is the same, whether the person is paying for the service or not (SGD ¶194). If Defendants focused on the students' education, instead of its own revenues, they could bring in models, have students work on other students, or let students work on the full range of skills they most need to practice with the many potential clients willing to receive a free haircut or other service (SGD ¶¶193-94). Indeed, Defendants readily admit that when students provide services for free, the customer service experience and educational value is the same

---

Plaintiffs' contention that the Paul Mitchell school compete with salons should be rejected as conclusory, illogical, and lacking foundation (Safadi Dec. ¶87, Eidle Dec. ¶68, Pederson Dec. ¶51, Mantea Dec. ¶74). *First*, the existence of an Advisory Board does nothing to prove that the schools do not compete with professional salons. In fact, it is not uncommon for business owners or members of professional associations, such as the California Bar, to attend meetings together despite being in direct competition. *Second*, none of the declarants identify how many salon owners are on the advisory board-out of the potentially hundreds of salons-nor whether those individuals consider the schools to be in competition. Accordingly, these conclusory statements regarding competition should be accorded no weight.

1 (SGD ¶194).[11]

2     Plaintiffs' assignments to janitorial and maintenance tasks, including working shifts

3 as "towel leaders" or in the dispensary, yields no educational benefit. If an employer

4 could argue that workers must "learn to clean" or "learn to do laundry" and so need not

5 be paid, then our minimum wage laws would be gravely undermined. Similarly, selling

6 co-branded pet products clearly had no bearing on their cosmetology education.

7 Defendants' statement that selling pet products was "a learning experience" for students

8 is indicative of their general commitment to students' education (SGD ¶234).

9     Defendants focused on servicing customers, selling products, and maintaining the

10 upscale associations of the Paul Mitchell brand, to the detriment of students' educations.

11 Paul Mitchell enrollees are "shortchanged educationally," as in *Marshall*, 473 F.Supp. at

12 476-77. Regardless of whether the Court applies a "totality of the circumstances" test or

13 the DOL six-factor test, the outcome is the same: Defendants converted students into

14 employees who generated significant revenues in their salons and whose labor displaced

15 that of other paid employees.

16
### 3. <u>The Ninth Circuit Has Not Adopted the *Glatt* Test, Which Is</u>
17 <u>Inapplicable To This Case.</u>

18     Defendants seek to import a test created by the Second Circuit in a case involving

19 interns working at private companies for academic credit. *See Glatt*, 811 F.3d, at 536-37.

20 As discussed below, the *Glatt* factors, created out of whole cloth to attempt to measure

21 the benefits of an unpaid internship, are wholly inapplicable here. Additionally, as the

22 Eleventh Circuit recognized in *Shumann v. Collier Anesthesia*, 803 F.3d 1199, 1212

23 (11th Cir. 2015), the *Glatt* test completely ignores a fundamental inquiry required by

24 *Portland Terminal* – namely, whether the alleged employer derives an "immediate

25 advantage" from the relationship. *Id*.; *cf. Laurelbrook*, 642 F.3d at 529 (analyzing

26

27    [11] For the same reasons, the training provided in Defendant's salons is not similar to that

28 provided in an "educational environment."

whether vocational school students were employees under the FLSA by "focusing on the benefits flowing to *each party*.") (emphasis added). Indeed, the *Glatt* factors do not address whether *any* benefit is provided to the employer as a result of the relationship, focusing the inquiry entirely on the intern, rather than weighing the benefits to both parties. As set forth above, *supra*, Section III.C.2.i., Defendants derived significant monetary benefits from students' labor, including revenues amounting to ████ % of their net income, promotion of the Paul Mitchell brand and products, and paid less in labor costs to run their salons, none of which served the educational benefit of the students who were each paying tens of thousands in tuition and fees.

Of the seven, non-exhaustive factors enumerated in *Glatt*, at least three of them are nonsensical when applied to a vocational school analysis, underscoring the failings of this test to properly address the ultimate issues of whether the employer was the primary beneficiary of the relationship and whether the employer derived an "immediate advantage", as required by *Portland Terminal*. Specifically, factor three questions "the extent to which the internship is tied to the intern's formal education program"; factor four asks whether "the internship accommodates the intern's academic commitments by corresponding to the academic calendar"; and factor five addresses whether the internship "is limited to the period in which the internship provides the intern with beneficial learning." *Glatt*, 811 F.3d at 536-37. None of these factors addresses the question of whether a purportedly educational institution has "relegated the educational function" of the school to a secondary status, and indeed would appear to establish a categorical exemption for vocational schools, regardless of the economic realities of the relationship. *Benjamin*, 2015 WL 6164891, *1; *see also Laurelbrook*, 642 F.3d at 524, *Marshall,* 477 F.Supp. 465, 476-77. Moreover, the *Glatt* test also jettisons the requirement established in *Portland Terminal*, and recognized by the DOL, that students work "under close supervision of existing staff." *Glatt*, 811 F.3d at 537 (factor six addresses whether an intern's work "complements" the work of paid employees); *see Portland Terminal*, 330 U.S. at 149-150; Mandelbaum Dec., Ex. AAA.

Additionally, it is clear that there are disputed issues of material facts even under Defendants' contorted analysis of the *Glatt* factors:

- Regarding factors one and seven (Defendants' Mot. at 27-28), Plaintiffs earned tips and other benefits from their work in Defendants' salon, including prizes and other benefits from their sales of Paul Mitchell products on behalf of the salons (SGD ¶¶265-66, 155-56, 86). Students who entered into the Phase II program were told the school would help them secure a job at a Paul Mitchell professional salon and that, if they joined Phase II, they would be more likely to get a job at a Paul Mitchell salon (GDF ¶255).

- Additionally, to the extent this factor is considered at all, factor one regarding Plaintiffs' awareness at the time they entered the schools that they would not be compensated should be accorded little weight, as the parties' intent to create an employment relationship is irrelevant and rights under the FLSA cannot be waived. *Alamo,* 471 U.S. at 301-02; *Donovan*, 676 F.2d at 470-71.

- Regarding *Glatt* factor five addressing beneficial training, the evidence contradicts Defendants' assertion that the salons provided educational training to students while they were performing a range of tasks unrelated to learning the skills and information set forth in the state curriculum requirements, as set forth above, *supra*, Section III.C.2.iii.

- Similarly, regarding *Glatt* factors two and three (Def. Mot. at 28-30), Defendants assert that the schools satisfy the state educational requirements and are thus providing a "benefit" to the students. However, Defendants' accreditation status does not answer the question of whether the labor they required of students is covered under the FLSA and, as set forth above, it is clear that students did not receive beneficial training while on the salon floor.

- The undisputed evidence additionally demonstrates that Defendants were keenly aware that their salons competed with "value or discount" salons, as set forth above, *supra*, Section III.C.2.ii. To argue that the salons would not exist but for students and student labor, as one district court stated, is hopelessly circular and does not address the question of unfair competition of unpaid labor and benefit to the employer that is at issue under the FLSA. *See Hollins v. Regency Corp.*, 2015 WL 6526964, *9 (N.D. Ill. Oct. 27, 2015).

### 4. <u>Defendants Rely Upon Non-Binding, Factually Distinguishable Cases Or That Apply Incorrect Legal Standards.</u>

Defendants rely upon a federal district court decision in the Northern District of California granting summary judgment in favor of cosmetology school defendants,

*Benjamin*, 2015 WL 6164891, currently on appeal. As set forth above, soon after the district court's order, the school's recertification for federal funding was denied by the Department of Education due to the school's misrepresentations regarding the education provided, as well as other issues including charging excessive fees for tardiness and absences (SGD ¶177). In that case, the court's analysis focused on "whether a school's efforts to make money from the clinic relegated the educational function of the clinic to a secondary status." *Benjamin*, 2015 WL 6164891, *1. The court made clear that the decision was based on the facts in that case, whereas a "reasonable jury" could conclude differently on a different factual record. *Id*., at *3-4. Here, there are a significant number of disputed material facts demonstrating that the educational function of the clinics was subordinated to Defendants' monetary gain, including through the lack of instruction and oversight, instructors' regular practice of signing off on procedures students had not performed because they were busy serving paying customers, Paul Mitchell's training and focus on selling only Paul Mitchell products including pet products unrelated to cosmetology practice, and the requirement that students regularly perform entire shifts of janitorial and maintenance work that was unrelated to their education.

Similarly, Defendants rely upon *Hollins*, 2015 WL 6526964, where the court granted summary judgment on the issue of employment in a case brought by cosmetology students. The court there applied the *Glatt* factors, but failed to address whether the educational benefit to the plaintiff was "relegated . . . to a secondary status", as analyzed in *Benjamin* and *Marshall*. Instead, the *Hollins* case illustrates the inapplicability of the *Glatt* factors in a vocational school context, where the analysis does little to address the ultimate question of whether the student or the school is the primary beneficiary of the relationship. There, too, the facts were very different from the case at bar, as the *Hollins* record indicated that the school's prices for services were "considerably lower" than those of licensed cosmetologists and there were no facts stated in the court's order regarding instructional and educational deficiencies. *Id*., at *1-2, *8.

///

In *Ortega*, a third district court case regarding cosmetology students and relied upon by Defendants, the facts again are very different from this case. In *Ortega*, the court noted that students were "supervised extensively", student-to-teacher ratios were low, students performed very limited janitorial work, the schools provided a client list to students to take with them when they graduated, and the salons were unprofitable. *Ortega v. Denver Inst. L.L.C.*, No. 14-CV-01351, 2015 WL 4576976 (D. Colo. July 30, 2015). Moreover, the court's analysis demonstrates a fundamental misunderstanding regarding the requisite weighing of benefits received by the parties. For example, regarding salon revenues, the court reasoned that the students, rather than school, benefitted from the revenues the school received as a result of their labor in the salons because the funds generated helped continue to run the school. *Id.*, at *16. This would be true for any employer whose business continues as a result of the labor of its employees.

Defendants additionally cite to two district court cases from the Third Circuit finding that cosmetology school students are not employees under the FLSA, both of which are currently on appeal. In *Jochim v. Jean Madeline Education Center of Cosmetology, Inc.*, 2015 WL 1565827 (E.D. Pa. Apr. 8, 2015), the court applied a test derived from the Third Circuit's independent contractor test. Rather than apply the factors required under *Portland Terminal* and *Alamo*, the court considered whether the employee's opportunity for profit or loss depended upon managerial skill and other factors related to independent contractor status but wholly irrelevant to the student-trainee context. *Id.*, at *6–7. Additionally, *Joachim* is distinguishable, inasmuch as the plaintiff there was unable to identify "any janitorial work falling outside the scope of permissible sanitation-related training or sanitary tasks related to the practice of cosmetology." *Jochim*, at *8. Here, Plaintiffs have shown that Paul Mitchell Schools required them to perform extensive, menial labor unnecessary for cosmetology certification. Likewise in *Atkins v. Capri Training Center, Inc.*, 2014 WL 4930906 (D.N.J. Oct. 1, 2014), the court ignored *Portland Terminal* and *Alamo*, holding that the applicable test focused on "dependency, the expectation of continued work, and a common sense view of the underlying facts and

31

1   circumstances." *Id*., at *9. *Atkins,* like *Jochim*, ignores the "immediate advantage"

2   conferred upon the employer by a trainee/student's unpaid labor, which *Portland*

3   *Terminal* makes a critical factor of the economic realities test. Moreover, unlike the

4   instant case, *Atkins* found that the small revenues from the clinic were overwhelmed by

5   the costs of the salon. *Atkins*, at *8–9.

6       **D.    Plaintiffs Are Employees Under California Law.**

7       Plaintiffs meet the California test of employment because Defendants control their

8   hours and working conditions, and decided not to pay them. An immediate benefit

9   indisputably runs to Defendants from "students'" work, and much of their menial labor

10  is unquestionably non-educational. On the other hand, Defendants' summary judgment

11  motion must be denied, based upon disputed assertions of the salons' overall educational

12  value. "Under California law, if reasonable people could differ on whether [an

13  employment relationship exists] based on the evidence in the case, the question is not for

14  the court to decide; it must go to the jury." *Cotter v. Lyft*, *Inc.*, 60 F.Supp.3d 1067, 1076

15  (N.D. Cal. 2015). Even if the underlying facts concerning overall benefits were not

16  disputed, as they are here, "the act of weighing and applying numerous intertwined

17  factors, based on particular facts, is itself generally the job of the jury." *Id*., at 1077.

18      **1.    <u>California's Minimum Wage Laws Protect Plaintiffs, following</u>**

19  **<u>*Martinez v. Combs*</u>.**

20      "Employment" under California law is defined in *Martinez v. Combs*, 49 Cal.4th at

21  35. *See also Futrell v. Payday California, Inc.*, 190 Cal.App.4th 1419, 1431 (2010)

22  ("We reiterate: in cases involving the issue of whether an employer-employee

23  relationship existed for purposes of the Labor Code wages statutes, we will apply the

24  *Martinez* definition"). Defendant contends that *Martinez* could have explicitly overruled

25  *Hutchison v. Clark,* 67 Cal.App.2d 155 (1944), but did not. It is not surprising, however,

26  ///

27  ///

28  ///

1  that the *Martinez* court did not bother to address *Hutchison*, a 1944 case which, in the

2  intervening six-plus decades was cited only once by a California court—in 1945.[12]

3      In *Ford*, the Court denied a cosmetology school's motion to dismiss, concluding that

4  cosmetology "student"-salon workers may be "employees" under the IWC wage orders,

5  applying *Martinez. Ford,* 2014 WL 9887277, at *5-6. Similar to the present case, the

6  *Ford* plaintiffs alleged that during their enrollment, they performed services on paying

7  members of the public, sold cosmetology products, and engaged in janitorial and clerical

8  work on behalf of the school, reflecting an employment relationship. *Id.*, at *2. The

9  Court rejected the defendant's argument that the students could not be "employees"

10 under California law based upon the text of the Cosmetology Act, Cal. Bus. & Prof.

11 Code §§ 7301, *et seq.*, *Hutchison v. Clark*, 67 Cal.App.2d 155 (1944), or DLSE

12 publications that appeared to rely on *Hutchison* and were issued before *Martinez.*

13 *Hutchison* had relied on the Cosmetology Act to find "students" could not be employees

14 as a matter of law. Similarly, in *Benjamin*, the court held that *Hutchinson* "is no longer

15 good law", following the reasoning in *Ford. Benjamin*, 2015 WL 6164891, at fn 1.

16      This Court should follow *Ford*'s unequivocal holding that "after *Martinez, Hutchison*

17 is no longer good law." *Ford*, 2014 WL 9887277, at *5; *see also California Pro-Life*

18 *Council, Inc. v. Getman*, 328 F.3d 1088, 1099 (9th Cir. 2003) (where there is convincing

19 evidence that the California Supreme Court would reject the California Court of

20 Appeal's interpretation of California law, California federal courts are not bound by the

21 Court of Appeal decision). *Ford* explained, 2014 WL 9887277, at *5 (emph. in orig.):

22          *Hutchison* was based on the assessment that there was a bright line between
           students and employees that limited the reach of the IWC. *See Hutchison*, 67
23          Cal.App.2d at 159-61. That reasoning is incompatible with *Martinez's* holding
           that the IWC has the authority to *define* what constitutes employment for the
24          purposes of California's minimum wage and overtime laws. Further, *Hutchison's*
           clear delineation between students and employees cannot be squared with the
25          more expansive definition of employment established by the IWC.

26 ────────────────────

27      [12]  *See Twentieth Century Lites v. California Dep't. of Employ.*, 158 P.2d 600 (Cal. Ct. App.
       1945), vacated sub nom. *Twentieth Century Lites v. California Dep't. of Employ.*, 28 Cal.2d 56

28 (1946) (cited in defining employment under California Unemployment Insurance Act).

Based on *Martinez*, "the California Supreme Court would hold that [beauty school] students may be properly classified as its employees, if they are within the definition of 'employment' established by the IWC" and, specifically, "IWC Wage Order No. 2 which applies to the 'personal service industry.'" *Id*. The *Hutchison* conclusion that "student"-salon workers are categorically non-"employees" is based on a superseded concept of employment and a *per se* categorical exclusion of students or trainees.

Moreover, Defendants' argument that the Cosmetology Act conflicts with the Labor Code is contradicted by the plain language of the statute. The Cosmetology Act does not prohibit paying students for work performed on the public. *Ford*, at *6 (citing Cal. Bus. & Professions Code §7319.5). The relevant provisions of the California Cosmetology Act are silent regarding whether cosmetology students can be paid. *Ford*, 2014 WL 9887277, at *4. Business and Professions Code section 7319.5 states, "students engaged in performing services on the public while enrolled in a school approved by the board shall not be required to be licensed under this chapter if they perform those services at the approved school in which they are enrolled." Unlike Section 7395.1, which specifically references working as an "unpaid extern" at an outside establishment,[13] Section 7319.5 contains *no prohibition* on payment while working for a school salon. As held in *Ford*, "the Legislature has only seen fit to specifically address the employment status of two groups in the Act: unpaid externs, and individuals working outside licensed establishments without compensation. Thus the employment status of cosmetology students is left to be determined by California employment law." *Ford*, 2014 WL 9887277, at *7 (internal citation omitted).[14]

---

[13]  Defendants' enrolled "students" are not externs under the California Cosmetology Act. Among the many stringent requirements (which Defendants here do not meet), an extern must be directly supervised by a licensed cosmetologist or barber and there must be a ratio of at least *one extern for every four licensed cosmetologists* – not 25 student-workers to one cosmetologist. Bus. & Prof. Code § 7395.1(c)(5).

[14]  Defendants cite a Cosmetology Board Circular Letter, which arose during the course of this litigation, on December 18, 2014 (Vogelzang Dec., Ex. K). The letter is entitled to no deference from the Court, and is neither instructive nor persuasive. The Cosmetology Board does not govern employment relationships in California. The circular letter does not analyze

Additionally, as one court found, interpreting a statute purportedly intended to protect consumers to mean that students could not be paid for their work, but that the schools deploying their labor could collect fees from the public "would lead to absurd results." *Winfield v. Babylon Beauty Sch. of Smithtown Inc.*, No. 13-6289, 2015 WL 1010431, *16 (E.D.N.Y., Mar. 7, 2015).

### 2. Under *Martinez* and Wage Order No. 2, Plaintiffs Are Employees of Paul Mitchell.

In *Martinez*, the California Supreme Court held that in actions to recover unpaid minimum wages under Labor Code section 1194, "the IWC's wage orders do generally define the employment relationship, and thus who may be liable." *Martinez,* 49 Cal.4th at 52. To "employ" has three alternative definitions. "It means: (a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." *Id.*, at 64 (emph. in orig.). "Unlike the multi-factor test employed in federal cases, any one of the three aspects – wages, hours, or working conditions – is sufficient to impute employer liability under California wage and hour law." *Torres v. Air to Ground Svcs.*, 300 F.R.D. 386, 395 (C.D. Cal. 2014) (discussing *Martinez*).

The current Wage Order Number 2 explicitly applies to Defendant's salons, as it applies to persons employed in the personal service industry, covering "beauty salons*, schools of beauty culture offering beauty care to the public for a fee*, barber shops," and other such institutions rendering services in health care or beauty. Wage Order No. 2, § 2(J); 8 CCR § 11020 (emph. added). As in *Martinez,* the Wage Order defines "employ" as meaning "to engage, suffer, or permit to work" and defines an "employer" as someone who "employs or exercises control over the wage, hours, or working conditions of any person." Wage Order No. 2, §§ 2(D), (F).

---

*Martinez*, which sets forth the controlling IWC framework defining the employment relationship. Instead, the Letter recites provisions of the Cosmetology Act, ending with conclusory statements that if a student receives wages for their labor it would violate Business and Professions Code section 7317. It provides no analysis and directly conflicts with the lengthy analysis and conclusion provided in *Ford*.

The *Martinez* court reviewed the history of the IWC and its legislatively-authorized broad authority, noting that "language consistently used by the IWC to define the employment relationship" was broad and "commonly understood to reach irregular working arrangements that fell outside the common law." *Martinez*, 49 Cal.4th at 65. The court cautioned against "confounding federal and state labor law" and explained that "courts must give the IWC's wage orders independent effect in order to protect the commission's delegated authority to enforce the state's wage laws and, as appropriate, to provide *greater protection to workers than federal law affords*." *Id*., at 68 (emph. added). *See accord Carrillo v. Schneider Logistics Trans-Loading & Distribution,* No. 11-8557, 2014 WL 183956, *15 n. 5 (C.D. Cal. Jan. 14, 2014) (California wage law provides more expansive employer definition than FLSA); *Torres*, 300 F.R.D. at 394 (citing *Martinez*) ("the IWC's definition of 'employer' is designed to afford greater protection to employees than the FLSA's definition of that term").

### i. <u>Defendants Exercised Control Over Plaintiffs' Work in the Salons</u>

Defendants fail to address the *Martinez* test at all. Factors that courts have considered under this test that indicate an employment relationship include: whether the employer set plaintiffs' schedules and determined whether to pay them, issued workplace rules, provided equipment and supplies, trained plaintiffs on how to perform tasks, supervised plaintiffs' work, assigned tasks to plaintiffs directly, fostered and enforced a specific customer service culture, instructed plaintiffs to follow directions of the employers' staff, provided mandatory training sessions, and inspected and approved of plaintiffs' tasks. *See, e.g., Torres*, 300 F.R.D. at 396–97.[15] Even where an employer did not control significant portions of the work, courts have found an employment relationship where the employer "still exercised the lion's share of control." *See Betancourt v. Advantage Human Resourcing*, 2014 WL 4365074, at *4–5 (N.D. Cal. Sept. 3, 2014).

---

[15] *See also McDonald v. Ricardo's on the Beach, Inc.*, 2013 WL 153860, *2 (C.D. Cal. Jan. 15, 2013); *Guerrero v. Super. Ct*, 213 Cal.App.4th at 928-29; *Castaneda v. Ensign Group, Inc.*, 229 Cal.App.4th 1015, 1019–20 (2014).

1    In this case, Defendants controlled Plaintiffs' hours, setting their work schedules and
2    fining students for failing to clock their hours according to their set schedules.
3    Defendants controlled working conditions, setting forth workplace policies, such as
4    (Defendants claims) a student rotation policy and the policy prohibiting students from
5    refusing to provide a requested service. Defendants disciplined Plaintiffs for failing
6    to adhere to policies through written warnings and suspensions (SGD ¶241). Defendants
7    further controlled working conditions by providing the tools and equipment for
8    performing services and dictating the products "students" had to sell to customers.
9    Defendants determined which services would be provided and at what price. Defendants
10   imposed customer service requirements, enforcing the Paul Mitchell corporate culture,
11   specific procedures for how customers should be greeted, and the procedures for
12   executing a service. Defendants assigned customers to "students," *e.g.*, giving particular
13   customers to "students" with demonstrated skills to meet those customers' requests.
14   Defendants required Plaintiffs to conform to their dress code. Accordingly, Defendants
15   are Plaintiffs' employers under the control prong of *Martinez*.

16                    **ii.  Defendants Suffered or Permitted Plaintiffs to Work.**

17    Courts have interpreted whether an employer "suffered or permitted" an employee to
18   work to mean that the employer had knowledge, real or constructive, of the work being
19   done. *See Betancourt*, 2014 WL 4365074, at * 5. The test focuses on whether the
20   employer knew or should know that an individual is performing work on its behalf, yet
21   fails to prevent the individual from working. *Id*. (citing *Martinez*, 49 Cal.4th at 69–70).
22   Defendants were well aware that students were laboring in their salons, which benefitted
23   Defendants through the millions of dollars of revenue they made from students' work as
24   well as reducing their need for hourly-paid staff as a result of the cleaning, laundry,
25   dispensary, and other menial tasks performed by students.

26    "Suffer or permit" under the Labor Code can also be guided by its meaning under the
27   FLSA. *Huntington Mem'l Hosp. v. Super. Ct.*, 131 Cal.App.4th 893, 903 (2005). Under
28   the FLSA, if an employer can terminate employment, the employment test is met. *See,*

1  *e.g., Bristol v. Bd. of Cnty. Comm'rs of Cnty. of Clear Creek*, 312 F.3d 1213, 1219 (10th

2  Cir. 2002) (en banc) ("Most important to control over the terms and conditions of an

3  employment relationship is the right to terminate it under certain circumstances") (cited

4  with approval in *EEOC v. Pacific Maritime Ass'n*, 351 F.3d 1270, 1277 (9th Cir.

5  2003)).[16] Defendants' disciplinary policy provides that they can suspend and/or

6  terminate a "student" any time for failing to follow workplace rules in the salons (SGD

7  ¶241). Defendants' policy, as stated in the mandatory school forms, provides that

8  students can be suspended for refusing to perform a service on a customer, missing

9  scheduled shifts, failing to follow the uniform policy, "cheating on the time clock", or

10 insubordination (Mandelbaum Dec., Ex. KK.)

### 3.  DLSE Guidance Supports a Finding that Plaintiffs are Employees.

12  The pre-*Martinez* DLSE Opinion Letter relied upon by Defendants and dated April 7,

13 2010, supports Plaintiffs' arguments. There, a non-profit organization ran an internship

14 program, which paid for an intern to attend college classes and placed interns at

15 sponsoring companies. Key to the DLSE's opinion that the intern was not an employee

16 was that the sponsoring companies did not derive an "*immediate*" advantage or benefit

17 from the interns' labor. DLSE Op. Ltr. 2010.04.07 (Vogelzang Declaration ISO

18 Defendants' Motion for Summary Judgment, Ex. L). The letter further notes that "both

19 DLSE and federal cases have previously noted that the exemption will not be found

20 where the intern's activities become an *integral* part of the business' activities and the

21 business derives any consequential economic benefit from the intern's activities." *Id.*, at

22 p.12, fn 11 (emph. in orig.). Also distinguishable from this case, but helpful, was the

23 DLSE's findings that the sponsoring businesses and the non-profit provided "*substantial*

24 *supervision*." *Id.*, at p.10. Here, cosmetology "students" were selling products and

25 largely performing services with little to no supervision. Rather than paying to join the

26

27  [16]  *See also Gonzalez v. Millard Mall Services, Inc.*, 2012 WL 727867, *6 (S.D. Cal. March 6, 2012) (denying summary judgment to alleged joint employer because dispute of fact existed as to defendant's authority to terminate plaintiffs and putative class members).

28

1  program, in the case described in the 2010 DLSE Opinion Letter, each company

2  contributed over $22,000 to sponsor each intern. *Id*., at p.14.

3      Similarly, in an earlier Opinion Letter, the DLSE examined a culinary externship

4  program, noting that if a culinary student is placed in an externship at a restaurant and is

5  required to bus tables or wash dishes, the DLSE would likely conclude an employer-

6  employee relationship existed. With such menial labor, the extern's services are not

7  directly related to educational goals and "have become an integral part of the

8  restaurant's activities from which the restaurant derives a substantial economic benefit."

9  DLSE Op. Ltr. 2000.05.17 (Vogelzang Dec., Ex. M), pp. 3–4. Likewise, here, Plaintiffs'

10 menial tasks were unrelated to their education but integral to Defendants' operations.

11     In an October 1993 letter, the DLSE reviewed a program where high school and

12 college students worked at a company for a period of 12 weeks as part of their education

13 and would perform tasks including answering phones, filing, mail distribution, copying,

14 faxing, and typing. The DLSE concluded that, based on the facts submitted, "*It appears*

15 *to us to be difficult to conclude that the company does not derive any immediate*

16 *advantage from the activities of the students.*" DLSE Op. Ltr. 1993.10.21, p.2

17 (Mandelbaum Dec., Ex. ZZ). The DLSE has also explained that the requirement not to

18 displace paid workers "means that the student is not to perform work that any other

19 employee would be expected to perform; not simply that the work performed by the

20 'student' does not result in a student replacing those workers currently on the payroll."

21 DLSE Op. Ltr. 1996.12.30, p.2 (Mandelbaum Dec., Ex. YY). The DLSE Opinion

22 Letters reject a blanket statement that any student performing work in the course of her

23 studies is not an employee, and support Plaintiffs' argument that employers deriving an

24 immediate benefit from students' work are subject to the Labor Code.

25          **E.    Plaintiffs Are Employees Under Nevada Law.**

26     Nevada's Cosmetology Act does not override or displace Nevada's wage laws. A

27 Nevada federal district court recently addressed this same argument, rejecting the beauty

28 school defendant's contention that it is barred as a matter of law from compensating its

students. *Guy*, 2015 WL 56048, at *2-3 (the Nevada Cosmetology Act "does not expressly prohibit the compensation of students; it merely prohibits advertising that the students will be compensated"). The Nevada Cosmetology Act, like California's, addresses the standards of professional skill and training for students, not workers' wages. In fact, the Cosmetology Act does not even speak to wages, except to expressly endorse cosmetology students receiving compensation from paying customers in the form of tips. *See id.,* at *2-3.

Employment under Nevada's minimum wage laws borrows from the FLSA's "economic realities" test. *Terry v. Sapphire Gentlemen's Club*, 336 P.3d 951, 956 (Nev. 2014), reh'g denied Jan. 22, 2015. Accordingly, for the same reasons stated above, in addition to the fact that the "students" here are a far cry from the limited exceptions envisioned in the Nevada Constitution, "students" are employees entitled to minimum wage under Nevada law.

## IV.   **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court deny Defendants' motion for summary judgment on the issue of whether Plaintiffs are employees under the FLSA, the California Labor Code, and the Nevada Constitution and Revised Statues.

DATED:  June 23, 2016                    Respectfully submitted,

RUDY, EXELROD, ZIEFF & LOWE, LLP
LAW OFFICE OF LEON GREENBERG
FELDMAN BROWNE OLIVARES, APC
BRYAN SCHWARTZ LAW

By:____*/s/ Chaya M. Mandelbaum*_____
CHAYA M. MANDELBAUM

*Attorneys for Individual and Representative Plaintiffs CLAIRE GERARD, et al., and all others similarly situated*

40